UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond Paul GREEN, Defendant-
Appellant.

No. 72–1908.

United States Court of Appeals,
Fifth Circuit.

March 13, 1973.

Rehearing Denied April 9, 1973.

Walter G. Arnold, Jacksonville, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., John J. Daley, Jr., Asst. U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, DYER and CLARK, Circuit Judges.

DYER, Circuit Judge:

Green appeals his conviction of unlawful possession of twenty-nine copper plates made in the similitude of a plate from which genuine obligations and securities of the United States are printed, with the intent to use the plates to counterfeit obligations of the United States, or any part thereof, in violation of 18 U.S.C.A. § 474. Prior to trial, Green moved to suppress all twenty-nine plates, on the ground that they were illegally seized during an unlawful search of his apartment. After hearing evidence on this issue, the trial court denied the motion. Green and the government then stipulated to waive a jury trial, and the case was tried before the district court judge. Green was found guilty as charged and received a five year suspended sentence. We affirm.

. In the early afternoon of December 9, 1970, while Green was away, a fire broke out in his apartment on the ground floor of an apartment building in Jacksonville, Florida. Two fire trucks and a number of Jacksonville firemen responded to the alarm. Unable to determine the origin of the blaze, the Fire Chief requested the help of Henry Melzer, the Deputy Fire Chief and Deputy State Fire Marshal for the City of Jacksonville,[1] whose principal duty was to investigate suspicious fires or fires of undetermined origin.

By the time Melzer arrived at the scene, the fire had been suppressed. No one occupying the apartment was present, and at this time the occupant's identity was unknown. Melzer began examining the scene, to determine the cause of the fire, which had been confined to the kitchen. Some of the woodwork was smudged, but the principal damage was to a pasteboard box on the floor that had been virtually reduced to ashes. Melzer briefly inspected the box and then made a tour of the apartment, looking for "hot spots" or other areas in the apartment that might be afire.

After determining there were no other danger areas, Melzer returned to the kitchen to examine the box in which the fire seemed to have started in order to determine its cause. His procedure was to have a fireman remove each item in turn from the ashes for Melzer's inspection. While engaged in this duty, fireman Lee discovered several metal plates and called Melzer's attention to them. As one of the plates was removed others similar to it were disclosed under-

---

1. In a technical sense, the State of Florida has not had any Deputy Fire Marshals since 1969, when, in a comprehensive revision of the State Code, the Florida legislature transferred fire prevention duties from the State Treasurer to the newly created Department of Insurance and abolished the title "Deputy Fire Marshal." "Deputies" thenceforth became known as "agents" of the Department of Insurance but retained all the powers and duties of their former offices, Fla.Laws 1969, ch. 69–106 and Chiefs of fire departments are ex officio agents of the State Fire Marshal. Fla.Stat.Ann. § 633.121.

neath. The plate was some six to eight inches long and four inches wide, and Melzer noticed the image of a $20 Federal Reserve Note on it. Although Melzer was not an expert on counterfeiting, he had on previous occasions worked in cooperation with the Secret Service and was immediately able to tell that the plate was probably a counterfeiting plate. Wanting to alert the appropriate investigative agency, he called Secret Service Agent Varenholt. Melzer described the plate to Varenholt over the telephone and furnished him the address of the apartment.

Before going to the apartment to examine the plates, Varenholt discussed the matter with his superior, and they determined not to seek a warrant for seizure of the plates. Whether this decision was based on the belief that they did not possess a sufficient description of the plates to obtain a warrant or on the belief that a warrant was unnecessary because the plates were already properly in the custody of a State officer is unclear.

When Varenholt arrived at the apartment, the firemen and trucks were still on the scene. One of the firemen let him into the apartment. Entering the kitchen, Varenholt observed that several firemen were sifting through a large pile of ashes on the floor and placing them in a tub. Melzer handed Varenholt the plate that had already been removed from the ashes, and Varenholt determined on the basis of a quick inspection that it was capable of printing a counterfeit impression. After Varenholt had examined the first plate, the remaining twenty-eight plates were handed to him one by one, each being initialed first by fireman Lee as he removed it from the ashes and then initialed again by Varenholt as he received it. In addition, a partial impression of the face of a $20 Federal Reserve Note was found amongst the plates.

After Varenholt had completed his examination of the twenty-nine plates, he waited for the tenant to return to the apartment. Green had previously come to the apartment, just after Melzer had called Varenholt, but he was told by a fireman at the door that he could not enter while firemen were inside, and he departed. After Varenholt had taken custody of the plates, and while he was waiting for the occupant of the apartment to arrive, Melzer completed his investigation. He concluded that the fire was a result of spontaneous combustion, caused by a chemical reaction between the metal of the copper printing plates, some rags that had been in the box, and possibly cleaning fluid that may have been placed on the plates to preserve them.

After Varenholt had waited in the kitchen for a short while, Green returned to the apartment. Varenholt advised him of his rights, and Green made a telephone call to his attorney. Varenholt informed Green that he had probable cause to arrest him; however, because Green's attorney assured Varenholt that Green would surrender himself on the following morning, Varenholt did not arrest him at that time.

Green's argument on appeal is twofold. First, he contends that the twenty-nine plates should have been excluded from evidence because they were the product of a warrantless invasion of his apartment in violation of the Fourth Amendment. Additionally, he claims that the evidence was insufficient to prove that he had the requisite statutory intent to use the plates found in his apartment for counterfeiting. We disagree.

## THE SEARCH OF GREEN'S APARTMENT AND THE SEIZURE OF THE COUNTERFEITING PLATES

The essential Fourth Amendment issues before this Court are (1) whether the initial warrantless intrusion by the firemen and Melzer was justified; (2) if so, whether the discovery and seizure of the plates were accomplished by actions within the limited scope of the justification for the initial intrustion; and (3) if so, whether a federal officer, who is expert in identification of the type of

suspected contraband discovered, must himself secure a warrant before he may enter the premises to confirm that the plates are contraband and to take custody of them when the plates are already legitimately in the possession of a State officer.

■ The fundamental facts determinative of the validity of the initial entry may be succinctly stated. Firemen entered an empty apartment in a multi-unit apartment building to extinguish a fire and called the Deputy Fire Marshal when they, including the Fire Chief, could not determine its cause. Although Green concedes that an existing fire in an apartment building is an emergency of sufficient proportions to permit the prompt and warrantless entry of firemen to suppress it, he would require that Melzer have obtained a warrant before he entered to investigate the cause of the fire.

The Supreme Court has had occasion to consider a question peripherally related to this in Camara v. Municipal Court, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L. Ed.2d 930, and in See v. Seattle, 1967, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943. Both cases involved the recurring issue of routine area inspections conducted in the interest of enforcing compliance with municipal building and fire safety codes without warrants. The Court concluded that such inspections were reasonable and consistent with legitimate governmental interest in the protection of the health and safety of the public, but required that any inspection of a particular premises as a part of such a routine area inspection be supported by a search warrant. However, the Court expressly limited this warrant requirement to the *routine and general inspection of an entire area* for the purpose of insuring general compliance with the safety codes involved—*i. e.*, in situations where no compelling reason exists necessitating the prompt inspection of a particular premises at a particular time.

Since our holding emphasizes the controlling standard of reasonableness,

nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See North American Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (seizure of unwholesome food); Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (compulsory small pox vaccination); Compagnie Francaise v. Board of Health, 186 U. S. 380, 22 S.Ct. 811, 46 L.Ed. 1209 (health quarantine); Kroplin v. Truax, 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle). On the other hand, in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day. . . .

Camara v. Municipal Court, 1967, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L. Ed.2d 930.

Unlike the area inspection, which does not focus on a particular premises and is conducted without reference to knowledge of a fire hazard at a given location, the investigation of an actual fire is logically and factually inseparable from the fireman's job of suppressing the blaze. The ordinary fireman is not an expert in the cause of fires. He cannot determine, after he douses the blaze, whether the danger is past or merely hidden, awaiting only a fresh supply of oxygen to set it off again with perhaps disastrous results.

A fire might have been caused by any of a myriad of conditions that would not be terminated by simply putting out the flame—*e. g.*, a faulty appliance, defective or worn out electrical wiring, or careless storage of flammable materials. Where the existence of a gravely dangerous condition has already manifested itself in one fire, it would be the height of folly for the firemen to enter, suppress the flames, and leave the premises without assurance that they would not be required to return, perhaps within minutes, to do it all again.

Critical to the Supreme Court's imposition of the warrant requirement in *Camara* and in *See* was the recognition that there is nothing in the nature of a routine area inspection that requires immediate entry into a particular structure in the area at a specific time. There is, however, such a necessity in the case of a fire. Until someone expert in the cause of fires arrives, inspects the scene, and determines that the fire has been completely extinguished, the firemen cannot reasonably depart. The imposition of a warrant requirement in such circumstances would immobilize the entire apparatus of fire protection. The absurdity of requiring the fire investigator to secure a warrant in order to search for the fire's cause is self evident.

In the case *sub judice* the district court correctly observed that "[a]scertaining the cause of the fire was necessary to assure that it was in fact totally extinguished and would not reoccur." In short, Melzer's entry was entirely reasonable and his search of the apartment necessitated by the exigencies of the circumstances. Clearly, this is not the type of investigation dealt with in *Camara* and *See* and, therefore, is not subject to the rule of those cases.

■ The facts of the case *sub judice* present a classic situation for application of the well established plain view doctrine. Melzer was lawfully present in Green's apartment for the purpose of investigating the cause of the fire. Although without a warrant, his presence was justified by the emergency created by the fire which required prompt ac-

tion to ensure the safety of the building and of its occupants. The plates seized were unexpectedly uncovered during Melzer's examination of the box where the fire had apparently started—a course of action distinctly within the scope of the justification for his presence in the first instance. Finally, upon removal of the first plate from the ashes, with the consequent exposure of the others underneath, it was immediately apparent to Melzer that the plates were evidence of the cause of the fire, and his initial judgment was that the plates were for counterfeiting. *See* Coolidge v. New Hampshire, 1971, 403 U.S. 443, 466–471, 91 S.Ct. 2022, 29 L.Ed.2d 564; *cf.* United States v. Allen, 5 Cir. 1973, 472 F.2d 145; United States v. West, 5 Cir. 1972, 460 F.2d 374.

Contrary to Green's suggestion, the Fourth Amendment does not require that Melzer have halted his investigation once the first counterfeiting plate was uncovered and have obtained a search warrant before continuing. The activity that led to the discovery of the plates was within the scope of the justification for Melzer's intrusion. Although Melzer, as we read the Florida law, had broad powers as a law enforcement officer to make arrests and seizures,[2] his conduct in uncovering and seizing the plates did not exceed the necessary investigative procedures required for him to fulfill his duty as a fire marshal[3] and to accomplish the limited purpose of determining the cause of the fire. Melzer's procedures did not vary from the ordinary and necessary actions of the fire department in such emergencies.

2. Fla.Stat.Ann. § 633.14 provides:

Agents of the state fire marshal shall have the same authority to serve summonses, make arrests, carry firearms and make searches and seizures, as the sheriff or his deputies, in the respective counties where such investigations, hearings, or inspections may be held; and affidavits necessary to authorize any such arrests, searches or seizures may be made before any magistrate having authority under the law to issue appropriate processes.

3. Fla.Stat.Ann. § 633.03 provides:

The state fire marshal shall investigate the cause, origin, and circumstances of every fire occurring in this state wherein property has been damaged or destroyed where there is probable cause to believe that the fire was the result of carelessness or design. Report of all such investigations shall be made on approved forms to be furnished by the fire marshal.

In the course of his investigation, it was incumbent upon him to sift the ashes of the box in which it was evident that the fire had been concentrated. In performing his duties as fire marshal, Melzer inadvertently found the metal plates which he determined had partially contributed to causing the fire. Unfortunately for Green, the plates also happened to be contraband.

■ Nor was it necessary for Secret Service Agent Varenholt to have obtained a warrant before he entered the apartment to confirm that the plates were of such quality as to be suitable for printing counterfeit obligations and to take custody of them. As explained above, the apartment had already been lawfully entered and searched. Once Melzer unexpectedly came upon the contraband, he had the authority as a law enforcement officer to seize it. Moreover, he had the *duty* as a fire marshal to seize all evidence relevant to his investigation of the fire's cause. Melzer certainly could have carried the plates to the fire station and sent them to the State crime laboratory or to the F.B.I. for chemical analysis. Likewise, he surely could have removed the plates and carried them to the Secret Service's headquarters, or have handed them to Varenholt outside of the apartment. Thus, Varenholt cannot be constitutionally tripped up at the threshold that he stepped across to make his confirmation and to take custody of the plates from Melzer.

The evidence is uncontroverted that this is all that Varenholt did. His conduct inside of the apartment demonstrates that he recognized and accepted the limited mission for which he was legitimately present. Varenholt never left the kitchen area, except once to use the telephone. The situation presented numerous unanswered questions to which a general exploratory search may have provided answers. Nevertheless, Varenholt opened no doors and examined only the evidence given him by fireman Lee and marshal Melzer.

■ The purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. Where a lawful intrusion has already occurred and a seizure by a State officer has validly taken place as a result of that intrusion, the invasion of privacy is not increased by an additional officer, albeit a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence. Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized. Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; Harris v. United States, 1968, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed. 1067. The apparent conflict between the Constitution and common sense which the plain view doctrine has reconciled is the same misconception which we here seek to dispel. *See* Mapp v. Ohio, 1961, 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

### THE EVIDENCE OF UNLAWFUL INTENT

■ Green also argues that there was no substantial evidence that he had the unlawful intent to use the plates found in his apartment for counterfeiting. We find this contention frivolous. Green completely ignores the fact that a partial impression of the face of a $20 Federal Reserve Note was found amongst the plates. Additionally, 18 U.S.C.A. § 474 only requires that one have the intent to use the plates to counterfeit *"any part"* of an obligation or security of the United States. While this evidence is circumstantial, by its very nature evi-

dence of intent is virtually always circumstantial. Moreover, a careful review of the record convinces us that the evidence was more than sufficient to justify and support the district court's guilty verdict.

Affirmed.