UNITED STATES of America

v.

**Bobby J. HERNDON et al.,**
**Defendants.**

No. 74–549–Cr–CF.

United States District Court,
S. D. Florida.

Feb. 20, 1975.

---

William Northcutt, Asst. U. S. Atty., Miami, Fla., for the United States.

Bernstein & Robrish, Miami, Fla. for defendant Bobby J. Herndon.

Max P. Engel, Miami, Fla., for defendant Donald E. Jones.

Louis Stoskopf, Miami, Fla., for defendant Thomas E. Jones.

## ORDER

FULTON, Chief Judge.

In an Indictment filed on September 25, 1974, the defendants were charged with the illegal operation of a still located at Barn #4, 19955 S.W. 248th Street, Dade County, Miami, Florida, in violation of 26 U.S.C. §§ 5601(a)(1), (2), (4), (8), 5602, 5604, and 18 U.S.C. § 371. On November 12, 1974, defendants Herndon, Donald Jones and Thomas Jones filed a motion to suppress various equipment, supplies and miscellaneous items useable in the manufacture of whiskey which were seized on April 12, 1974 during a search of the barn, the house, several vehicles, and the person of Thomas Jones in the vicinity of 19955 S.W. 248th Street, Miami, Florida. Defendants contend that the search constituted a violation of the Fourth Amendment of the United States Constitution in that it was made without a search warrant and not incident to a lawful arrest. The government argues that the search was justi-

fied due to exigent circumstances. The government concedes that the defendants all have standing to bring this motion to suppress: Thomas Jones was on the premises when the search took place; Donald Jones was renting the premises; and Bobby Joe Herndon was living on the premises.

On December 13, 1974, the Court held an evidentiary hearing on defendants' motion. Testimony presented at the hearing established that on Friday, April 12, 1974, at 7:31 P.M. the Dade County Public Safety Department Perrine Substation received a call that there had been "shots fired in the area" at 19955 S.W. 248th Street. At 7:33 P.M., a patrol car unit was dispatched with one back-up unit. At 7:46 P.M. these two units responding to the call arrived on the scene.

As reflected by plaintiff's exhibit 1A, 19955 S.W. 248th Street, Dade County, Florida, is a rural farm area. The subject property consists of a house approximately 150 Feet from the road and a single story barn approximately 300–400 Feet from the rear of the house. The barn is approximately 50 Ft. in width and 500 Ft. in length.

Officers Charter and Dwyer were the two units who were dispatched to answer the call at 7:33 P.M. Officer Dwyer was the backup unit. Prior to either officer reaching the scene of the alleged shots, they were met by an unidentified white female in a light colored Cadillac who communicated with Officer Dwyer that one of the participants in the alleged shooting was parked on the corner of 199th Avenue and 244th Street. Both officers proceeded to this area. Both officers approached the defendant, Thomas Jones, who was seated in his automobile. Mr. Jones' automobile was parked approximately 200 yards from the rear of the subject barn. During the conversation with defendant, Thomas Jones, a 16 year old white male approached the officers and informed them that Thomas Jones did, in fact, reside at the scene and was, in fact, a participant in the "shots fired" as reported earlier.

Thereafter, Officer Dwyer left the area with his unit and proceeded to 19955 S.W. 248th Street, where the house and barn are located. Officer Charter remained with defendant Jones, who was not yet under arrest.

Upon arriving at the scene, Officer Dwyer spoke with several more neighbors who informed him that they had observed three white males leave the barn, one entering his automobile and driving to the road in front of the house, the other two leaving the house at which time shots were fired in the immediate area. After this information was related to Officer Dwyer, he approached the house and heard the telephone ring. On the front porch Officer Dwyer looked into the living room area through the front picture window and then entered the house, without knocking, through the partially opened door, and proceeded through the living room area into the kitchen where he answered the phone. Officer Dwyer testified that he entered the house and subsequently the barn to look for injured persons or additional witnesses in connection with the shooting investigation. Officer Dwyer then looked around and saw no blood or injured people in the house.

Having found no one in the house, Officer Dwyer communicated with Officer Charter to proceed to the barn to search for injured people there. Officer Charter then arrived with defendant Jones in the rear cage portion of the car. Officer Charter testified that Jones had been arrested by this time for loitering and prowling because he could not explain his presence in the area. Officer Charter testified that the barn door was partially opened approximately 4 to 6 inches. The officers entered the barn equipped with flashlights and remained in the barn approximately 5 to 10 minutes. In the rear portion of the barn the officers came across what appeared to them to be some form of a "still". The officers then departed the barn, went back to the house at which time Officer Dwyer telephonically communicated with the Perrine Substation for them to dis-

patch the duty Lieutenant to proceed to the scene. Lt. Lyons arrived at the scene at approximately 8:30 P.M. and spoke with both Officers Dwyer and Charter. Subsequently, all three officers re-entered the barn and again viewed what the officers concluded was a possible illegal "still". The officers then departed the barn, re-entered the house at which time Lt. Lyons again telephonically communicated with the Perrine Substation and requested specifically that a Federal Treasury Agent, Agent Nowicki be telephoned and informed that an illegal still was being operated at the subject location. Agent Nowicki and Agent Harmon of the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department (hereinafter referred to as "ATF") arrived at approximately 10:00 P.M.

Treasury Agent Nowicki, after receiving the communication from the Perrine Substation, called Agent Harmon and requested that he accompany him to the location in the Southwest area of Dade County where the illegal "still" had been reported. Agent Nowicki readily admitted in his testimony that he attempted no communication whatsoever with any United States Attorney, Federal Judge or Magistrate at any time whatsoever on the evening of April 12, 1974.

Upon the arrival at approximately 10:00 P.M., Agent Nowicki testified that he read defendant Jones his rights and was handed a small wrench and knife purportedly taken from defendant, Thomas Jones upon his arrest by Officer Charter. Agent Nowicki purportedly observed a substance "mash" on the wrench itself and requested of defendant Jones to take his shoes off for possible evidence. Both Agents Nowicki and Harmon spoke with Lt. Lyons and Officers Charter and Dwyer as to their observations in the subject barn. The agents then proceeded to the barn, and viewed the still. From there they went to the house, following the electric wires from the still water pump. In the house they found several receipts from the Tropigas Company, a Georgia telephone

book and some shoes, on the soles of which was mash. The gas receipts were in a closet in the hall by the electric panel where the wires terminated. The closet was open. The phone book was in a drawer which was partially open in a table and the shoes were on the floor in the bedroom.

The ATF agents then went outside the house and peeked into a truck camper parked on the lawn. In the truck they observed cardboard cartons similar to the ones they saw beside the still. These cartons were labeled "Reliance Products Ltd., Winnipeg, Canada." The truck was seized and the glove compartment was searched. An auto repair bill was found therein. The interior of the rear of the truck camper smelled of whisky. This occurred about 11:00 P.M.

The ATF agents then went to the car in which Jones was found. They saw in it items similar to those they saw by the still. They searched and seized it. In it they found a hydrometer.

All of the state and federal agents who testified at the hearing readily admitted that absolutely no attempt whatsoever was made to obtain any arrest or search warrants. In their view, none were required due to the exigent circumstances. Therefore, unless the Court finds that the searches were not justified and thus grants the motion to suppress, the Government will introduce at trial the following items from these searches and seizures:

1. The driver's license, wrench and shoes found on Thomas Jones.

2. Pictures and testimony about the still and related paraphernalia from the area of the barn.

3. The receipts, phone book and shoes from the house.

4. The cartons and receipt from the truck camper in the yard.

5. The hydrometer found in the car in which Jones was arrested.

Two searches were conducted in this case, the first by county police, and the second by federal ATF agents. In order

to be upheld, both searches must be valid.

Defendant Thomas Jones was placed under arrest by the county police officers at about 8:15 P.M. on April 12, 1974 for loitering and prowling. However, the search of the house and barn by the state officers can not be considered as incident to a legal arrest for the following reasons: 1) Officer Dwyer had already entered and searched the house before Officer Charter placed Jones under arrest. 2) The officers entered the barn pursuant to their investigation of the shooting incident which had no relation to an arrest for loitering and prowling. Later in the evening an ATF agent placed Jones under arrest for the additional charge of possession of a switchblade knife. This arrest, however, occurred after both the house and barn had been searched by the county officers. 3) The county officers testified that both the loitering and prowling and possession charges against Jones were later dismissed for lack of prosecution and never refiled. This factor is some support for defendants' contention that the arrests themselves were not legal.

■ The Court finds, however, that the county officers' search was legal as based upon the exigent circumstance of looking for victims of a shooting incident. Being in a place where they had a right to be, the officers found the still because it was in plain view. Witnesses had reported that they had heard shots fired and had seen three men running in the vicinity of the house and barn. Therefore it was logical and prudent for the officers to consider that there might be someone injured and in need of help in the house or the barn. The fact that no victims were actually found does not negate the real possibility that existed.

In Guzman v. Estelle, 493 F.2d 532, 537 (5th Cir. 1974), the court held that lack of time in which the search warrant could have been secured is an exigent circumstance that justifies a warrantless search. In this case, it would be senseless to expect police officers to obtain a warrant before answering the dispatch call, or, once on the scene, before entering the buildings. Clearly, in matters involving possible injury by gun shot, time is of the essence.

■ Once legally inside the barn, the still was in plain view. In Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970), Justice Stewart held that where the initial intrusion that brings the police within plain view of an article is supported not by a warrant but by one of the recognized exceptions to the warrant requirement, the seizure is legitimate. He stated that the plain view doctrine may be applied where an officer is not searching for evidence against the accused, but inadvertently comes across an incriminating object. Id. at 466, 91 S.Ct. 2022. Where objects fall in the plain view of an officer who has a right to be in the position to have that view, they are subject to seizure and may be introduced in evidence. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed. 2d 1067 (1968).

In this case the officers were searching for victims of a shooting incident. They entered the house and barn looking for victims, and inadvertently came across evidence of the operation of a still. No evidence was presented at the hearing to indicate that the officers' testimony of the reasons for their conduct should not be believed. Therefore the Court concludes that the search and seizure conducted by the county officers were legal.

The Court further finds that the search by the federal officers was also legal. The Court does not base its decision on the ground suggested by the government: that there was insufficient time for the ATF agents to obtain a warrant. In fact the evidence established that the ATF agents were called by the county officers at about 9:00 P.M., and that the magistrate could be reached until about 11:00 P.M. and was located only fifteen or twenty miles away. Furthermore, Federal Agent Harmon testified that the stills each weighed about 2800 pounds, and that he was not afraid

that someone would walk away with a still. As for smaller items in the house, the county police had surrounded the area. Therefore, no emergency existed concerning the speed with which the federal agents arrived on the scene.

The federal search was legal because it was based upon a legal search by county officers. Crucial to this determination are the facts that the county police called the federal agents to the scene, and that the federal search was directly related to the object of the county search.

The Court bases its determination that the federal search was legal upon the direct precedent established by Judge Dyer in United States v. Green, 474 F.2d 1385 (5th Cir. 1973), cert. denied, 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973). While Green was away, a fire broke out in his apartment. City firemen entered the apartment to put out the fire, and requested the Fire Chief to come to the premises to determine the cause of the fire. During his investigation the Fire Chief inadvertently discovered counterfeiting plates. The Fire Chief then called the Secret Service. In response to the call, a Secret Service agent went to Green's apartment, and the Fire Marshall handed him the plates he had discovered. At no time did either the city or federal authorities seek to obtain a warrant.

Judge Dyer held that it was not necessary for the secret service agent to have obtained a warrant before he entered the apartment even though there was plenty of time in which to do so. 474 F.2d at 1390. Judge Dyer explained that the purpose of the Fourth Amendment is to prevent unauthorized invasions of privacy. However, once that privacy is lawfully invaded, a subsequent search of the area already searched constitutes no additional invasion of privacy and therefore no violation of the Fourth Amendment. Judge Dyer's holding is directly applicable to the factual situation here:

> The purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. Where a lawful intrusion has already occurred and a seizure by a State officer has validly taken place as a result of that intrusion, the invasion of privacy is not increased by an additional officer, albeit a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence. Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized.

474 F.2d at 1390.

The rationale which justifies the federal search is that the subsequent intrusion does not significantly increase a preexisting legitimate interference with a protected interest. United States v. Soriano, 482 F.2d 469, 476 (5th Cir. 1973). Thus the determination that the subsequent search does not significantly add to the invasion of privacy caused by the initial search is crucial. As pointed out in *Soriano*, this requirement is met if the successive intrusions are close in time, practically identical in nature and analytically and factually separable only because made by two different sovereigns. 482 F.2d at 476 n. 13. The Court finds that all of these criteria were present in this case.

In United States v, Carney, 356 F. Supp. 855, 858 n. 1 (M.D.Tenn.1973), the court distinguished its facts from *Green* in that in *Green* the secret service agent entered "subsequent to and pursuant to" the discovery of the Fire Marshall. The rationale is that independent searches constitute separate and

additional invasions of privacy. However, here as well as in *Green,* the federal authorities entered the premises pursuant to a call by the local authorities, and the search conducted by the federal agents was directly related to the objects discovered by the county officers. Therefore, based upon the authority of United States v. Green, United States v. Soriano, and United States v. Carney, the Court concludes that the search and seizure conducted by the federal officers were legal.

The Court has considered all of the evidence presented at the evidentiary hearing, and has studied all of the submissions filed by the parties. For the foregoing reasons, the Court concludes that the searches of both the county and federal officers were legal, and therefore the motion to suppress the evidence seized therefrom is hereby denied.