[No. G005757. Fourth Dist., Div. Three. Apr. 14, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK ZANE GLANCE, Defendant and Appellant.

COUNSEL

Schulman & McMillan, Byron K. McMillan and Paul B. Herbert for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Pamela A. Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOORE, J.—Appellant Patrick Zane Glance was charged by information with possessing cocaine for sale in violation of section 11351 of the Health and Safety Code. He was further alleged to have possessed 28.5 grams or more of cocaine for sale and 57 grams or more of a substance containing cocaine within the meaning of Penal Code section 1203.073, subdivision (b)(1). Following the denial of his motion to suppress evidence, Glance pled guilty and admitted the special allegation.

Glance appeals both from the judgment of conviction and the denial of his motion to suppress. He contends the police conducted a warrantless search of his residence in violation of his Fourth Amendment rights and he challenges a subsequent consent search and search warrant obtained in reliance upon observations made during the warrantless entry.

# I

## FACTS[1]

On December 20, 1986, at about 8:55 p.m., Officer Michael McDermott of the Newport Beach Police Department responded to a general broadcast radio call reporting a structural fire at 4309 Seashore Drive. The first to arrive at the scene, McDermott observed a split level residence "fully involved in flames." Seeing fire flaring through the front entryway of the house and around the upstairs east side, endangering neighboring homes, McDermott put out a call for additional fire units.

Within minutes, at least two fire engines arrived, and fire department personnel began to fight the flames while McDermott assisted with traffic and crowd control. By 9:45 p.m., the fire was out. McDermott, a trained arson investigator whose duties included the collection and preservation of evidence, contacted Fire Captain Tony Detevis and asked if there was anything suspicious about the fire. Detevis, who had little training in determining the cause of fires, responded he did not know. Both men then donned special breathing instruments provided by Detevis and proceeded into the darkness and heavy smoke.

Captain Detevis accompanied McDermott throughout the house looking for certain pet snakes that apparently were missing; however, his main concern in going along was to make sure the breathing equipment he had furnished to McDermott continued to function properly. McDermott, on the other hand, entered the residence specifically to see if there was any evidence of arson that could be identified or collected. To that end, he toured the structure looking for flammable liquids, accelerant trails, secondary fires, and other signs of causation.

McDermott and Detevis first entered a downstairs bedroom. There, McDermott shined his flashlight on a nightstand and saw, in plain view near a large safe, a folded paper bindle and a single-edged razor blade, items he recognized, based on his training and experience, as narcotics paraphernalia. As the two men continued through the residence, upstairs, McDermott saw an open backpack sitting on the floor of an open hall closet. Prior to McDermott's entry into the residence, a paramedic had forced his way into the closet looking for animals reported missing. Exposed inside the backpack were magazine pages with corners torn off into square bindle-size shapes and white crystalline powder residue consistent with cocaine. Also in

---

[1] Because appellant pled guilty before trial, the facts are drawn from the reporter's transcript of appellant's motion to suppress evidence pursuant to Penal Code section 1538.5.

the closet, near the backpack, was a second safe. A third safe was located in an upstairs bedroom. Although he opened none of the safes, based on his training and experience and other observations around the residence, McDermott believed they contained narcotics or sums of money from illegal narcotics transactions.

All told, McDermott remained inside the house for about 30 minutes, leaving once to replace his air pack. Upon completing his walk through the premises, McDermott met with Police Lieutenant Jim Carson, who had apparently been contacted during the fire by Glance. McDermott told Carson about the safes and narcotics paraphernalia he had observed, and Carson summoned Detective David Byington, a narcotics expert, to the scene. Upon his arrival, Detective Byington met with McDermott, and McDermott described the fire and his other observations. Byington, in turn, confronted Glance.

Byington advised Glance of McDermott's report and further informed him about information Byington had pulled from police intelligence files indicating Glance might be involved in selling cocaine. Byington requested Glance's permission to search the house for narcotics, but Glance refused. Byington then told Glance he would be leaving, but that he was "going to attempt to obtain a search warrant" and thought he had sufficient probable cause to present to a magistrate. (Cf. *People* v. *Ruster* (1976) 16 Cal.3d 690, 701 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269], disapproved on another point in *People* v. *Jenkins* (1980) 28 Cal.3d 494, 503-504, fn. 9 [170 Cal.Rptr. 1, 620 P.2d 587].)

Five to ten minutes later, while Byington conversed with other officers, Glance approached Byington and told him he had changed his mind. Byington responded that Glance was under no obligation to consent to a search, that he did not want Glance to feel pressured, and that he intended to seek out a magistrate in any case. Glance, however, agreed to permit a search so long as he could accompany Byington through the house.

Together, Glance and Byington followed McDermott into the house and into the bedroom where McDermott had first found evidence of contraband. Byington was shown the bindle and the razor blade and saw the safe previously described to him by McDermott. Outside the room, at the base of the stairs, Byington noticed a scorched piece of paper with handwritten figures on it. On closer examination, Byington found it contained names, amounts of money, and pay-owe information consistent with a narcotics ledger.

Byington asked Glance to take him upstairs and show him his bedroom, but Glance replied, "There's nothing up there." Byington reminded Glance

that McDermott had already seen two safes on the upper floor, yet Glance denied any other safe was in his residence. Byington asked Glance again to direct him to his room, but Glance declined, saying, "I don't want to continue this." Byington interpreted Glance's comment as a withdrawal of consent and, along with McDermott, immediately left the residence.

Byington then went back to the station house and prepared a search warrant affidavit relating McDermott's comments about the fire and both officers' narcotics-related observations. After obtaining a telephonic search warrant, at about 3 a.m., Byington returned to 4309 Seashore Drive and conducted a thorough search. That search uncovered miscellaneous narcotics packaging materials, including paper bindles and plastic baggies, along with a green plastic sifter full of white powder residue, an Ohaus brand triple beam scale, a dufflebag containing marijuana residue, the backpack full of white powdered residue, a cocaine handbook, a pay-owe ledger, $637 in United States dollars, foreign currency, 70 grams of marijuana, a half full quarter pound bottle of crystallized mannitol, more than 67 grams of white crystalline powder containing cocaine, and various items establishing appellant's dominion and control.

## II

### THE LEGALITY OF OFFICER McDERMOTT'S WARRANTLESS ENTRIES

Appellant urges us to reverse the judgment and the order denying his motion to suppress evidence, contending the warrantless entries into his residence by Officer McDermott violated his reasonable expectation of privacy guaranteed by the Fourth Amendment. Appellant argues further that his subsequent consent to search and the search warrant obtained by Detective Byington were "derivative fruits," tainted by the initial illegality. We do not agree.

It is well established that "[e]xpectations of privacy are particularly strong in private residences" (*Michigan* v. *Clifford* (1984) 464 U.S. 287, 297, fn. 7 [78 L.Ed.2d 477, 486, 104 S.Ct. 641]), and warrantless searches thereof are presumed to be unreasonable. (*Payton* v. *New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639, 650-651, 100 S.Ct. 1371].) Indeed, the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Id.* at pp. 585-586 [63 L.Ed.2d at p. 650], quoting *United States* v. *United States District Court* (1972) 407 U.S. 297, 313 [32 L.Ed.2d 752, 764, 92 S.Ct. 2125].) However, warrantless entries of private homes have been approved under limited conditions exhibiting "exigent circumstances." (See, e.g., *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642], and cases cited in *Coolidge* v.

*New Hampshire* (1971) 403 U.S. 443, 475, fn. 30 [29 L.Ed.2d 564, 588, 91 S.Ct. 2022].)

 Appellant concedes that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable' " (*Michigan* v. *Tyler* (1978) 436 U.S. 499, 509 [56 L.Ed.2d 486, 498, 98 S.Ct. 1942]), but he insists McDermott's entry into his house *after* the fire was out was constitutionally infirm. Appellant goes so far as to suggest only "a *bona fide* firefighter" may enter a residence searching for the cause and origin of a fire absent a warrant. For this extraordinary proposition, appellant relies on *Michigan* v. *Tyler, supra.*

Appellant claims, "In *Tyler,* the [United States Supreme Court] reversed an arson conviction on account of a warrantless search far less obnoxious . . . than McDermott's series of invasions. . . . [F]iremen had discovered two containers of flammable liquid inside [a warehouse] . . . . Later, fire and police investigators made a series of warrantless entries. . . . [¶] Rejecting the prosecution's argument that repeated police or fire department entries, after the fire is out, to investigate for 'cause and origin' are somehow exempt from the warrant requirement, the court emphatically held . . . *the necessity of the warrant persists.*"

Appellant misinterprets *Tyler.* There, fire department personnel responded to a midnight fire at a furniture store. The flames were reduced to "smoldering embers" before 2 a.m. when the fire chief arrived at the scene. Knowing that one of the chief's duties was to determine the cause of the fire, a lieutenant informed the chief that two plastic containers of flammable liquid had been found inside. Along with the chief, the lieutenant reentered the building to examine the containers. "Concluding that the fire 'could possibly have been an arson' " (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 502 [56 L.Ed.2d at p. 493]), the chief called a police detective to the scene. At about 3:30 a.m., the detective entered the building, *without* a warrant, and attempted to photograph the containers and the interior of the store. He soon abandoned his efforts, however, due to the remaining heavy smoke and steam. The chief again reentered the building " '. . . to see if there was any further evidence [of] what the cause of the fire was.' " (*Ibid.*)

By 4 a.m., the fire was completely extinguished, and all the firefighters had departed. The police detective returned with the chief to the fire station, taking the containers with him. At about 8 a.m., the fire chief returned to the scene with an assistant chief "whose job [it] was to determine the 'origin of all fires that occur[red] within the Township.' " (436 U.S. at p. 502 [56 L.Ed.2d at p. 493].) Following a cursory inspection of the premises, they left, but the assistant chief returned with the police detective an hour later,

making several reentries to collect evidence of causation. *All of these entries were made without consent and without benefit of a warrant.* Further, contrary to appellant's contention, all of these entries were *approved* by a majority of the United States Supreme Court. (See 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (2d ed. 1987) § 10.4(d), pp. 705-706.)

Appellant's argument here, that the exigency ended when the fire was extinguished, was *expressly rejected* by the *Tyler* majority. The Michigan Supreme Court had held, "[T]he exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame." (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 510 [56 L.Ed.2d at p. 498].)

The United States Supreme Court responded, in a portion of the majority opinion in which *all* eight Justices participating in the decision joined, "We think this view of the firefighting function is unrealistically narrow. . . . Prompt determination of the fire's origin may be necessary to prevent its recurrence . . . . Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, *officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional.*" (436 U.S. at p. 510 [56 L.Ed.2d at pp. 498-499], italics added, fn. omitted.)

The majority concluded, "On the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries . . . . As the fire was being extinguished, [the fire chief] and his assistants began their investigation, but visibility was severely hindered by darkness, steam, and smoke. Thus they departed at 4 a.m. and returned shortly after daylight to continue their investigation. Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. *Under these circumstances, we find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.*" (436 U.S. at p. 511 [56 L.Ed.2d at p. 499], italics added.)[2]

---

[2] The judgment of the Michigan Supreme Court granting Tyler a new trial was affirmed *solely* as a consequence of a warrantless search performed at the furniture store *25 days after* the fire was extinguished, clearly beyond the "reasonable time" permitted.

*Michigan* v. *Clifford, supra,* 464 U.S. 287, also cited by appellant, is in accord. In *Clifford,* an early morning residential fire was extinguished, and all fire and police officials left the scene at 7:04 a.m. Approximately six hours later, arson investigators reappeared and found a work crew boarding up the house. A neighbor informed the investigators the Cliffords were out of town but, after being contacted about the fire, had specifically instructed that their home be secured pending their return. Despite their observation of the obvious steps the Cliffords were taking to ensconce their domain, the investigators reentered the residence, found the cause of the fire in the basement, and *then* searched the entire house, stem to stern.

Not surprisingly, the state's warrantless intrusions in *Clifford* were found to violate the Cliffords' reasonable expectation of privacy. The residents had not only refused to consent to a warrantless entry, they had taken affirmative steps to prevent it. Thus, the *Clifford* majority held, "[W]here a homeowner has made a reasonable effort to secure his fire-damaged home after the blaze has been extinguished and the fire and police units have left the scene, . . . a subsequent postfire search must be conducted pursuant to a warrant, consent, or the identification of some new exigency." (464 U.S. at p. 297 [78 L.Ed.2d at p. 486], fn. omitted.)

In contrast to *Clifford,* in the case before us, neither fire nor police personnel had left the premises when McDermott made his two excursions into the smoke-filled structure. Visibility was poor, yet smoke damage was apparent throughout the house. McDermott was unaware at the time of his entries of what caused the blaze and discovered the cause only *after* his inspection was complete. Moreover, Glance took no measures to secure his home from inspection. Under these conditions, it is apparent *Tyler* controls, and no warrant was required for McDermott to enter the residence in search of the fire's origin and cause.

That McDermott was a police officer and not a fire official does nothing to alter our analysis. We but echo the words of our nation's highest court when we say the right of police to respond to emergency situations is beyond dispute. (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408].) "Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . Cf. *Michigan* v. *Tyler, supra,* 436 U.S., at 509-510 . . . . 'The need to protect or preserve life or avoid serious injury is justification for what [otherwise] would be [ ] illegal absent an exigency or emergency.' [Citation.]" (*Id.* at pp. 392-393 [57 L.Ed.2d at p. 300], fns. omitted.)

Thus, in *Mincey,* the United States Supreme Court authorized police coming upon the scene of a homicide to conduct "a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." (437 U.S. at p. 392 [57 L.Ed.2d at p. 300].) Similarly, when police come upon the scene of a fire, they may make warrantless entries into affected structures as soon as it is reasonably safe to do so and may there remain for a reasonable time in order to ascertain the cause and origin of the blaze, such investigation being essential to protect and preserve life and property. (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 510 [56 L.Ed.2d at pp. 498-499]; cf. *State* v. *Bell* (1987) 108 Wn.2d 193, 200-201 [737 P.2d 254, 259-260]; *People* v. *Connolly* (1973) 55 Ill.2d 421 [303 N.E.2d 409, 412].)

We agree with the court in *United States* v. *Green* (5th Cir. 1973) 474 F.2d 1385, cert. denied, 414 U.S. 829 [38 L.Ed.2d 63, 94 S.Ct. 55], which aptly explained: "The purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. . . . [However,] [o]nce the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency . . . to secure a warrant before he enters the premises . . . is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized. [Citations.]" (*Id.* at p. 1390.)

The same reasoning applies here. Both fire and police personnel are agents of the state; both are subject to Fourth Amendment requirements. (*Michigan* v. *Tyler, supra,* 436 U.S. at pp. 504, 506 [56 L.Ed.2d at pp. 495-496].) ■ Once a fireman has lawfully entered a burning building, "the invasion of privacy is not increased by an additional officer, albeit a [police] officer," entering the edifice to seek out the fire's genesis. (*United States* v. *Green, supra,* 474 F.2d at p. 1390.)

Moreover, "[t]he ordinary fireman," as was the case with Detevis, "is not an expert in the cause of fires. He cannot determine, after he douses the blaze, whether the danger is past or merely hidden, awaiting only a fresh supply of oxygen to set it off again with perhaps disastrous results." (474 F.2d at p. 1388.) Thus, the benefit to be found in the assistance of a fire *or police* department investigator trained in determining the cause and origin of fires is plain.

This is not to say there are no limits on what police may do once inside a fire-damaged structure. "In essence, they step into the shoes of the fire fighters. They cannot enter any area that the fire fighters were not justified in entering . . . ." (*State* v. *Bell, supra,* 108 Wn.2d at p. 201 [737 P.2d at p. 259].) They cannot search any area the fire fighters were not justified in

searching. They may only venture into areas affected by the flames and places where evidence of arson might reasonably be found.

■ Under the circumstances of this case, we conclude Officer McDermott's warrantless entries into Glance's residence did not violate the Fourth Amendment, and the extent of his search throughout the smoke-filled dwelling was well within the scope of a proper investigation. Furthermore, because McDermott's presence inside the house was not constitutionally impermissible, he was at liberty to seize the contraband he discovered in plain view. (*Michigan* v. *Tyler, supra,* 436 U.S. at p. 509 [56 L.Ed.2d at p. 498], citing *Coolidge* v. *New Hampshire, supra,* 403 U.S. at pp. 465-466 [29 L.Ed.2d at pp. 582-583].)[3]

## III

### THE VALIDITY OF THE SEARCH WARRANT

■ Next, appellant asserts that even if the initial entries by McDermott were valid, issuance of the warrant was induced by a material misrepresentation in the underlying affidavit. Appellant strenuously argues that affiant Byington intentionally misled the magistrate as to the severity of the fire because, once the investigation was completed, it was evident the fire had originated downstairs, and most of the fire damage was confined to the lower floor.

Our consideration of appellant's challenge to the search warrant's validity is governed by federal law. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].) *People* v. *Crabb* (1987) 191 Cal.App.3d 390 [236 Cal.Rptr. 385] succinctly summarizes the requirements of the leading United States Supreme Court case, *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674]. As encapsulated by *Crabb, Franks* holds that a defendant is entitled to challenge the veracity of a facially valid search warrant only if he makes "a substantial preliminary showing that (1) the affiant has made statements which were deliberately false or in reckless disregard of the truth and (2) the affidavit's remaining content after [its] false statements are excised is insufficient to justify a finding of probable cause. [Citation.]" (*People* v. *Crabb, supra,* 191 Cal.App.3d at p. 393, fn. omitted.)

The question of whether Glance satisfied the initial requirement of *Franks* by showing the affiant made misleading or reckless statements in his

---

[3] Accordingly, we hold that appellant's consent to search and the search warrant were not tainted derivative fruits of any primary illegality.

affidavit was decided by the trial court after an evidentiary hearing. The trial court found Byington's affidavit free from false averments and held defendant was not entitled to a traversal. Appellate review of such a factual finding is strictly limited. If the trial court's determination is supported by substantial evidence, it will be upheld on appeal. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

Appellant argues, as he did below, that "Byington misinformed the magistrate that 'the . . . structure was fully engulfed in flames . . . ,' [ ] painting the dramatic picture of a devastating raging inferno. . . . [T]his was a flat falsehood, known to Byington to be so by the condition of the house once the fire was out. Fire damage was limited to just one or two rooms . . . and [the fire] never got more than 10 or 12 feet high." In light of the evidence presented at the hearing of appellant's motion to suppress, these allegations fail even to satisfy the first prong of the *Franks* test.

Substantial evidence was adduced at the hearing to support Byington's averment. Fire Captain Tony Detevis testified, for instance, the flames rose high enough *above* the ground floor of appellant's residence to cause the glass on the second story of the neighboring residence to bow. Prescription bottles on a study desk on the top level of appellant's own home were found melted down to the desktop, and significant smoke damage was sustained throughout the house. The second floor fascia was charred. The record thus fully supports the trial court's finding that no intentional misrepresentation or reckless statement was made.

Because Glance failed to make "a substantial preliminary showing" that Byington's statements were recklessly made or deliberately false, we have no occasion to reach the second prong of the *Franks* formula. As stated by the court in *People* v. *Crabb, supra, "Franks's* premise in part is that the magistrate's acceptance of the affiant's veracity is not to be disturbed, and further judicial inquiry into the subject is not warranted, unless the defendant first shows some reason to believe the affiant has willfully misstated or omitted material facts from the affidavit." (191 Cal.App.3d at p. 396.) Accordingly, we conclude the defense was not entitled to traverse the warrant.

Finally, almost in passing, appellant suggests the warrant was overbroad because it authorized "a search for all manner of incidents of narcotics *trafficking.*" Assuming McDermott's only legitimate observations occurred on the lower level of the residence, appellant contends one razor blade, a bindle with white powder residue and a safe are insufficient evidence of narcotics trafficking to support the search authorized by the magistrate.

Although appellant purports to attack the breadth of the warrant, his brief discussion of the point belies his terminology. Appellant's argument is

not directed at "overbreadth" but at the question of whether the razor blade, bindle and safe constituted sufficient cause to believe he was engaged in narcotics trafficking. In view of our determination that *all* of McDermott's observations were properly made, it should be manifest that the warrant was supported by probable cause.

Judgment affirmed.

Crosby, Acting P. J., and Sonenshine, J., concurred.