UNITED STATES of America, Plaintiff,

v.

Christian Ben Patrick PEREZ,
Defendant.

No. CR76–346.

United States District Court,
N. D. Ohio, E. D.

April 21, 1977.

John P. Berena, Cleveland, Ohio, for U. S.

Timothy J. Potts, Cleveland, Ohio, for Christian Ben Patrick Perez.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On October 27, 1976 the defendant, Christian Perez, was indicted on three counts of knowingly possessing a shotgun in violation of 26 U.S.C. §§ 5861(d), 5861(h), 5871, and on November 12, 1976 he moved the Court "to suppress all evidence the government intends to introduce at trial . . . which was seized by safety forces of the City of Lakewood and/or agents of the United States Government on or about October 1, 1976 from 2126 Mars Avenue, Lakewood, Ohio." *See*, Fed.R.Crim.P. 41.

On December 1, 1976 the Court conducted a hearing on the defendant's motion to suppress and subsequently analyzed the transcript of that hearing. On January 24, 1977 the Court denied the motion to suppress and defendant Perez was tried by the Court. In order to expedite the trial, portions of the transcript from the suppression hearing were entered into the record by stipulation with the agreement that Perez retained a continuing objection, based on the Fourth Amendment, to the admission of all evidence derived from the search of his premises conducted on October 27, 1976. At the conclusion of the trial the Court found the defendant guilty as charged in the indictment.

In accordance with Fed.R.Crim.P. 12(e), the Court issues "its essential findings" on the suppression question in this Memorandum of Opinion.

The issue before this Court is whether a comprehensive warrantless police search of the buildings on a defendant's residential premises violates the Fourth Amendment, when the search is conducted after firemen and policemen have extinguished a fire on the premises, placed the defendant in custody, determined that no persons other than government officials are present, and located a large quantity of high explosives on the defendant's property. The Court rules such an emergency search valid under the Fourth and Fourteenth Amendments and denies Perez's motion to suppress.

## I

### FINDINGS OF FACT

On the evening of October 1, 1976, at approximately 9:00 p. m. Lakewood Narcotics Detective John Hoyt had the defendant's residence at 2126 Mars Avenue in Lakewood, Ohio under surveillance for narcotics dealings when he heard a fire alarm broadcast that summoned firemen and policemen to that residence. Hoyt broadcasted a warning to the responding police officers advising them to be careful when they entered the dwelling because a shooting occurred there on August 29, 1976, and requested them "to keep their eyes open for drugs."[1]

Assistant Fire Chief Rogers, who was the first fireman to arrive at the defendant's residence, testified that he encountered a woman[2] outside the house who told him that the fire was in the kitchen. Rogers entered the kitchen, observed the house full of smoke, and determined that the smoke

---

1. *See*, Transcript of the Hearing on the Motion to Suppress at page 85. Hereinafter, references to this transcript will be "Tr."

2. This woman, who is unidentified, stood outside the house holding a baby. Tr. 12, 25.

originated from a burning ice cooler located on top of the stove. Simultaneously with the discovery of the cooler, Rogers was joined inside the house by several police officers and eight to ten firemen. Fire Captain McKee and fireman Welker extinguished the burning cooler and placed it in the backyard in "less than a minute." (Tr. 36–37). Based on his training and observations, Rogers determined that the entire dwelling should be searched,[3] despite the termination of the fire in the cooler. He testified:

"Q. From what you concluded as to the way the things appeared to be on the surface, did you have any reason to believe that there was a fire in any location other than in the kitchen?

"A. No. Well, the only possibility was an extension into the wall, but that would be difficult to determine until we had enough of the smoke out of the way to really check it out." Tr. 24.

Assistant Fire Chief Rogers, aided by Police Officers Boomer and O'Grady, searched each room in the house to determine whether the fire spread elsewhere, and whether any people were located anywhere in the dwelling.[4] During this *first* search Rogers and Police Officer O'Grady observed plants, which O'Grady recognized as marijuana, located on a second floor porch.[5]

While the three men were searching the second floor, Fire Captain McKee and Fireman Welker, both of whom were located on the first floor in the kitchen, saw defendant Perez repeatedly run in and out of the rear door of the house, which led from the kitchen to the backyard, and hurdle a large ventilation fan during each trip through the

door.[6] On one occasion Perez carried a suitcase in one hand and a duffle bag in the other, causing Fireman Welker to yell, "This fellow is taking off somewhere," and advised Police Officer Boomer, who had come downstairs, of Perez's conduct.[7] Boomer went outside searching the backyard with his flashlight and discovered a military type duffle bag with the top open resting against a fence.[8] Through the open top of the bag Boomer saw the exposed end of a cardboard box with the word "Gelitin" printed on it in large black letters. From his military experience Boomer understood that the word "Gelitin" pertains to explosives. After taking the box out of the duffle bag he observed the words "High Explosives" printed on a previously unrevealed exterior side of the box, and upon opening the box he discovered several large cardboard cylinders labeled "Explosive Dangerous."[9]

While Officer Boomer examined the backyard, Officer O'Grady and Assistant Fire Chief Rogers completed their *first* search of the second floor of the house, found no occupants or additional sources of fire on that floor, and returned to the first floor where O'Grady saw defendant Perez talking with Fireman Foran in the kitchen.[10] O'Grady approached Perez, identified himself as a police officer, ascertained that Perez was the resident of the dwelling, and immediately arrested Perez for "cultivation of marijuana." As O'Grady was "patting down" Perez, Officer Hill "came running from outside of the house . . . yelling 'he [Perez] has dynamite, he has dynamite.'"[11] O'Grady advised Perez that he was also under arrest on the additional charge of "possession of a dangerous ord-

---

3. For a discussion of the search procedures which firemen always employ when they are extinguishing a fire in a building *see* Tr. 12–14.

4. *See*, Tr. 16, 53, 88–89.

5. *See*, Tr. 17, 88–89.

6. *See*, Tr. 33–35, 38, 44–46; *see also*, Government's Exhibits 6 (suitcase), 7 (duffle bag).

7. *See*, Tr. 35, 47–49, 53–54.

8. *See*, Tr. 55.

9. *See*, Tr. 55–57, 58, 68, 71–73; *see also*, Government's Exhibits 9, 10, 11.

10. *See*, Tr. 25, 88–89.

11. *See*, Tr. 90.

nance," and Perez was taken from the premises by a police officer."[12]

At this time smoke "hovered" in the house and firemen "were all around the house."[13] O'Grady radioed Police Sergeant Kremperger who arrived on the scene in "two to three minutes," and took charge of the investigation.[14] Kremperger was "accosted" by Boomer outside the rear door of the house and informed of the location of the dynamite.[15] Kremperger examined the contents of the box which Boomer found in the rear yard, concluded that it was dynamite, returned to the house, and made three telephone calls seeking advice regarding how he should proceed with the investigation. First, he phoned his superior, Police Captain Keller, who advised him to search the entire premises immediately; second, he phoned the prosecutor, but was unable to get an answer; and third, he phoned Municipal Court Judge Harold Craig.[16] After Kremperger described the situation, Judge Craig, who correctly understood that dynamite had been found in the backyard and inaccurately believed that exposed flames were burning inside the house, told Kremperger that a public emergency existed which authorized an immediate *warrantless* search of the house.[17]

At this time all of the police officers on the scene conducted a comprehensive *second* search of the whole house, opening drawers, closets, and exposing areas not openly visible. The purpose of the *second* search was to search for "explosives or dangerous devices."[18] During the *second* search Officer O'Grady found and photographed a shotgun which was exposed to "plain view" in a closed closet on the first floor, and took the weapon into his custody.[19] After the police concluded their examination of the house, they searched the unattached garage where they found a suitcase which corresponded to the description of the suitcase which McKee and Welker had observed Perez carry out of the house when he took the duffle bag into the backyard. They immediately opened the suitcase and found a second shotgun, which they seized.[20] No testimony establishes that flames or smoke were ever present in the garage.

The *second* search of the house and garage took one and a half hours to complete,[21] during which time none of the officers obtained a search warrant. Defendant Perez moves this Court to suppress both shotguns seized during the search of his premises on the theory that the warrantless search of his residential property violated his Fourth and Fourteenth Amendment rights under the United States Constitution.

12. *See,* Tr. 91.

13. *See,* Tr. 91.

14. *See,* Tr. 92.

15. *See,* Tr. 78.

16. *See,* Tr. 78–79.

17. *See,* Tr. 5–7, 79.

18. *See,* Tr. 93, 97–98. The Lakewood firemen remained on the scene for "several minutes, until the smoke cleared out" of the home. The search team which conducted the second search was composed solely of police officers. The record is unclear regarding whether the firemen were present throughout the whole duration of the second search. *See,* Tr. 109–111.

19. *See,* Tr. 80, 93–94; Government's Exhibit 13 (photograph of shotgun as it was found by O'Grady).

20. *See,* Tr. 63–64, 73–75, 81–82; Government's Exhibits 6 (suitcase), 8 (double barreled shotgun). *Compare,* Tr. 48, 53–54.

21. *See,* Tr. 109. The record reveals no evidence to suggest that any persons, other than governmental officials, were on Perez's premises after the arrest and during the second search.

## II

THE REASONABLE EXPECTATION OF PRIVACY TEST ENUNCIATED IN *KATZ V. UNITED STATES* RE-QUIRES THIS COURT TO BALANCE A DEFENDANT'S DIMINISHED PRIVACY INTEREST AGAINST THE GOVERNMENT'S LEGITIMATE INTEREST IN CONDUCTING A WARRANTLESS EMERGENCY SEARCH FOR HIGH EXPLOSIVES FOUND ON THE DEFENDANT'S PROPERTY AFTER FIGHTING A FIRE IN HIS DWELLING.

Defendant Christian Perez charges that the weapons found in his home and unattached garage during a warrantless search of his premises violated his Fourth Amendment rights. The Government contends that the search of Perez's premises was lawfully conducted pursuant to an emergency search exception to the Fourth Amendment warrant requirement.[22]

Prior to *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Fourth Amendment protected citizens against governmental intrusion into constitutionally protected areas.[23] In *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) the Court held that the Fourth Amendment protected only against physical trespassory intrusions involving the seizure of physical objects. The *Olmstead* court's technical trespass test was expanded in *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) when the court held that the Fourth Amendment protected against *any actual* governmental intrusion,[24] trespassory or otherwise, into a constitutionally protected area. Under the pre-*Katz* approach the warrant protection of the Fourth Amendment was most strenuously enforced to pro-tect a defendant in his residential premises. *See, Boyd v. United States,* 116 U.S. 616, 622, 625–631, 634–635, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Adams v. New York,* 192 U.S. 585, 598, 24 S.Ct. 372, 48 L.Ed. 575 (1904); *Weeks v. United States,* 232 U.S. 383, 391–395, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Gouled v. United States,* 255 U.S. 298, 307–311, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Carroll v. United States,* 267 U.S. 132, 147–153, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925); *Byars v. United States,* 273 U.S. 28, 30, 32–33, 47 S.Ct. 248, 71 L.Ed. 520 (1927); *United States v. Berkeness,* 275 U.S. 149, 155, 48 S.Ct. 46, 72 L.Ed. 211 (1927); *United States v. Lee,* 274 U.S. 559, 562–563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Olmstead v. United States,* 277 U.S. 438, 464, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Go-Bart Co. v. United States,* 282 U.S. 344, 356–358, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *United States v. Lefkowitz,* 285 U.S. 452, 463–464, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Taylor v. United States,* 286 U.S. 1, 5–6, 52 S.Ct. 466, 76 L.Ed. 951 (1932); *Nathanson v. United States,* 290 U.S. 41, 46–47, 54 S.Ct. 11, 78 L.Ed. 159 (1933); *Davis v. United States,* 328 U.S. 582, 592–594, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Harris v. United States,* 331 U.S. 145, 151, fn. 15, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *Johnson v. United States,* 333 U.S. 10, 13–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Trupiano v. United States,* 334 U.S. 699, 705–710, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); *McDonald v. United States,* 335 U.S. 451, 454–456, 69 S.Ct. 191, 93 L.Ed. 153 (majority), 458–460, 69 S.Ct. 194–196 (Jackson, concurring) (1948); *Lustig y. United States,* 338 U.S. 74, 78–80, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Brinegar*

---

**22.** The Government relies on *McDonald v. United States,* 335 U.S. 451, 458–460, 69 S.Ct. 191, 93 L.Ed. 153 (Jackson, concurring) (1948).

**23.** *See,* Aynes, "*Katz and the Fourth Amendment: A Reasonable Expectation of Privacy or, A Man's Home Is His Fort,*" 23 Cleve.St.L.Rev. 63, 64 (1974). Hereinafter, cited as "Aynes."

**24.** "In *Silverman v. United States,* these requirements were liberalized to require an *actual intrusion* in place of a physical trespass and to include intangibles within the scope of the Fourth Amendment." Aynes at 64. *Compare, United States v. Carriger,* 541 F.2d 545, 549–550 (6th Cir., 1976).

*v. United States,* 338 U.S. 160, 180–181, 69 S.Ct. 1302, 93 L.Ed. 1879 (Jackson, dissenting) (1949); *United States v. Jeffers,* 342 U.S. 48, 51–54, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Silverman v. United States,* 365 U.S. 505, 509–512, fn. 4, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) ("The Fourth Amendment and the personal rights which it secures have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *Chapman v. United States,* 365 U.S. 610, 613–618, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); *Wong Sun v. United States,* 371 U.S. 471, 480, fn. 8, 484–487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Ker v. California,* 374 U.S. 23, fn. 14, 83 S.Ct. 1623, 10 L.Ed.2d 726 (Justice Clark's Opinion), 47–64, 83 S.Ct. 1636–1645 (Justice Brennan's Opinion) (1963); *Fahy v. Connecticut,* 375 U.S. 85, 87–92, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); *Stoner v. California,* 376 U.S. 483, 486–490, fns. 4, 5, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Clinton v. Virginia,* 377 U.S. 158, 84 S.Ct. 1186, 12 L.Ed.2d 213 (1964); *Lewis v. United States,* 385 U.S. 206, 213, 87 S.Ct. 424, 17 L.Ed.2d 312 (Justice Brennan, concurring) (1966); *Hoffa v. United States,* 385 U.S. 293, 300–303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 528–534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Berger v. New York,* 388 U.S. 41, 44, 49–53, 58, 63–64, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

However, under the *"protected area"* approach of the pre-*Katz* era, the United States Supreme Court continually recognized that a defendant's residential premises were not a sanctuary where a criminal possessed an absolute, unqualified immunity against warrantless searches. Thus the court recognized exceptions to the warrant requirement when the search or seizure on the defendant's residential premises was conducted pursuant to the defendant's voluntary invitation to an undercover agent, *see, Lewis v. United States,* 385 U.S. 206,

210–212, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966): immediately after a lawful arrest inside his premises, *see, Marron v. United States,* 275 U.S. 192, 198–199, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *Harris v. United States,* 331 U.S. 145, 151–154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *United States v. Rabinowitz,* 339 U.S. 56, 61–66, fn. 5, 70 S.Ct. 430, 94 L.Ed. 653 (1950); *Ker v. California,* 374 U.S. 23, 41–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); or because of an emergency, *see, Johnson v. United States,* 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *McDonald v. United States,* 335 U.S. 451, 459–460, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Chapman v. United States,* 365 U.S. 610, 615, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Ker v. California,* 374 U.S. 23, 42, fn. 13, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (four Justices); *Warden v. Hayden,* 387 U.S 294, 297–300, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967) (Hot pursuit of fleeing felon justified the search of the defendant's whole house "prior to or immediately contemporaneous with" defendant's arrest.)

Under pre-*Katz* Fourth Amendment analysis, a warrantless search of a defendant's residential premises was presumptively unconstitutional unless the search fell into one of the narrowly delineated categories which constituted an exception to the standard warrant requirement. *See, Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 8, 70 L.Ed. 145 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant."); *Stoner v. California,* 376 U.S. 483, 487, fn. 5, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Katz v. United States,* 389 U.S. 347, 357, fns. 18, 19, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (Characterizing the pre-*Katz* dwelling search cases the High Court wrote, ". . . searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated excep-

tions." [25]); *Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (Analyzing the pre-*Katz* warrantless dwelling search cases).

In *Katz, supra,* the United States Supreme Court rejected the "protected area" doctrine with respect to residential as well as business premises searches.

". . . [T]he parties have attached great significance to the characterization of the telephone booth from which the petitioner placed in his calls. The petitioner has strenuously argued that the booth was a 'constitutionally protected area.' The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. *What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.* . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *See, Katz, supra,* 389 U.S. at 351–352 (emphasis added), fns. 8, 9, 88 S.Ct. at 511. *Compare, Desist v. United States,* 394 U.S. 244, 246–247, 89 S.Ct. 1048, 22 L.Ed.2d 248 (1969).

After *Katz.* the Supreme Court recognized no constitutionally protected areas, only constitutionally protected people, and consequently the High Court abandoned the notion that warrantless intrusions into a defendant's residential premises were *per se* violative of the Fourth Amendment's warrant requirement unless justified under one of the narrowly drawn warrant exceptions. Under *Katz* a defendant's residential premises are protected from warrantless intrusions only to the extent that he manifests a personal expectation of privacy in his dwelling which society objectively deems reasonable. Mr. Justice Harlan's Concurring Opinion elucidates *Katz's* shift in emphasis.

"As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule . . . is that there is a twofold requirement, first that a person have exhibited an actual *(subjective) expectation of privacy* and, second, that *the expectation be one that society is prepared to recognize as 'reasonable.'* Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Katz, supra,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, concurring) (emphasis added); *see also, Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *United States v. White,* 401 U.S. 745, 750–754, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976).

---

**25.** *Compare, United States v. Rabinowitz,* 339 U.S. 56, 64, 70 S.Ct. 430, 434, 94 L.Ed. 653 (1950), where the court validated a general warrantless search of the defendant's premises after his arrest thereon. The court cited five factors which rendered the warrantless search reasonable and then wrote, "Assuming that the officers had time to procure a search warrant, were they bound to do so? We think not, because the search was otherwise reasonable . . . ." The court went on to write at 66, 70 S.Ct. at 435, "To the extent that *Trupiano v. United States,* 334 U.S. 699, [68 S.Ct. 1229, 92 L.Ed. 1663], requires a search warrant *solely* upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled" (emphasis added). Therefore, assuming that the police conducted the *second* search of Perez's residential premises without obtaining a warrant which they could have procured, that fact, standing in isolation, is insufficient to invalidate the *second* search of the Perez residence.

Post-*Katz*, the constitutional validity of any warrantless search depends on whether the Government officials who conduct the search intrude into a place which: (1) the defendant himself believes is private at the time of the intrusion; (2) society generally recognizes as private, at the time of the intrusion.

In recent post-*Katz* cases the Supreme Court indicated that criminal defendants possess differing degrees of reasonable expectations of privacy depending on the facts and circumstances in each case. Likewise, in cases in which the defendant's reasonable expectation of privacy is abated or diminished by conditions unique to the asserted privacy interest,[26] the High Court examines the legitimate purposes offered by the Government for conducting a warrantless search, and balances the governmental interest against the defendant's competing abated or diminished privacy interest. In *Gustafson v. Florida*, 414 U.S. 260, 264–266, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), and *United States v. Robinson*, 414 U.S. 218, 231–235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) the Supreme Court balanced the defendant's interest in protection from a full body search, after a custodial arrest based on probable cause, against the legitimate governmental interests of enhancing the arresting officer's safety and preserving evidence of crime. The Court in both cases concluded that the governmental interest implemented by the warrantless search surpassed any privacy interest which a validly arrested defendant retained. Mr. Justice Powell's Concurring Opinion illuminates the analysis of the majority;

"Although I join the opinions of the Court, I write briefly to emphasize what seems to me to be the essential premise of our decisions.

"The Fourth Amendment safeguards the right of 'the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .' These are areas of an individual's life about which he entertains legitimate expectations of privacy. I believe that an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person. Under this view the custodial arrest is the significant intrusion of state power into the privacy of one's person. If the arrest is lawful, the privacy interest guarded by the Fourth Amendment is subordinated to a legitimate and overriding governmental concern. No reason then exists to frustrate law enforcement by requiring some independent justification for a search incident to a lawful custodial arrest. This seems to me the reason that a valid arrest justifies a full search of the person, even if that search is not narrowly limited by the twin rationales of seizing evidence and disarming the arrestee. The search incident to arrest is reasonable under the Fourth Amendment because the privacy interest protected by that constitutional guarantee is legitimately abated by the fact of arrest." *Robinson, supra* at 237–238, 94 S.Ct. at 494 (Powell, concurring).

The High Court applied the balance of interests approach implicit in *Robinson* and *Gustafson, supra* when it held that a validly arrested defendant may be subjected to a warrantless complete body search in jail, long after an arrest based on probable cause. *See, United States v. Edwards*, 415 U.S. 800, 803–805, 809, fn. 9, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).[27] Thus the High

---

**26.** The unique conditions which may diminish an identifiable privacy interest may inhere in society's view of the nature of the object or area searched, *see, South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (automobile searches). Such diminishing conditions may also arise from the occurrence of events which expose normally secluded areas or activities to public or governmental scrutiny. *See, United States v. Herndon*, 390 F.Supp. 1017, 1021 (S.D.Fla.,

1975); *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976).

**27.** The balancing test was applied in other cases. Thus the Supreme Court in *United States v. Watson*, 423 U.S. 411, 419–425, 96 S.Ct. 820, 826–828, 46 L.Ed.2d 598 (1976), held that an arrest warrant was not necessary before arresting a defendant beyond the sanctuary of his business or residential premises after balancing the defendant's interests in the war-

Court in *Gustafson, Robinson,* and *Edwards* permitted warrantless searches on the theory that the competing privacy interests were abated by lawful intrusions upon privacy.

The Court engaged in a similar balancing process in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Plurality Opinion); and *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In *Cardwell* the court, recognizing the existence of "lesser expectation[s]" of privacy under the Fourth Amendment,[28] held that scraping paint from the exterior of a lawfully impounded automobile constituted an intrusion into so diminished a privacy interest that a warrant was not required to justify the seizure:

"One has a *lesser expectation of privacy* in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view. . . . 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' *Katz v. United States,* 389 U.S. 347, at 351, [88 S.Ct. [507], at 511, 19 L.Ed.2d 576]; *United States v. Dionisio,* 410 U.S. 1, at 14, [93 S.Ct. [764], at 771, 35 L.Ed.2d 67]. This is not to say that no part of the interior of an automobile has Fourth Amendment protection; the exercise of a desire to be mobile does not, of course, waive one's right to be free of unreasonable government intrusion. But insofar as Fourth Amendment protection extends to a motor vehicle, it *is the right to privacy that is the touchstone of our inquiry.*

"In the present case, nothing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has been deemed to protect, were searched or seized and introduced in evidence. With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, *the invasion of privacy, 'if it can be said to exist, is abstract and theoretical.'* . . . Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments." *Cardwell, supra,* 417 U.S. at 590–592, 94 S.Ct. at 2469–2470 (emphasis added).

In *Cady, supra* the court balanced the lawfully arrested defendant's cognizable, but diminished, privacy interest[29] in the

rant protection against the adverse impact that such an arrest warrant requirement would have on the administration of justice. The Court noted, "The *balance* struck by the common law . . . has survived . . . ." *Watson, supra* at 421, 96 S.Ct. at 827. *See also,* Justice Powell's analysis of the pragmatic balance to be struck on Fourth Amendment issues in his concurring opinion in *Watson, supra* at 429–433, 96 S.Ct., at 830–832, where he candidly notes, "Logic . . . would seem to dictate that arrests be subject to the warrant requirement at least to the same extent as searches. But logic sometimes must defer to history and experience." Other courts have viewed Fourth Amendment warrant problems as questions of interest balancing. *See, Camara v. Municipal Court,* 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967) (". . . balanc[e] the need to search against the invasion which the search entails."); *Unit-*

*ed States v. Kroll,* 351 F.Supp. 148, 151–152 (W.D.Mo., 1973); *United States v. Bustamante-Gamez,* 488 F.2d 4, 8–9 (9th Cir., 1973), *cert. den.* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974) (". . . benefits . . . from obtaining a warrant . . . would not have justified this additional risk"). In support of the balancing of interest tests, *see also,* LaFave, "*Administrative Searches and the Fourth Amendment: The Camara and See Cases,*" 1967 Sup.Ct.Rev. 1, 18–20.

**28.** *See, Cardwell, supra,* 417 U.S. at 590, 94 S.Ct. 2464.

**29.** The *Cady* court, 413 U.S. on page 442, in a footnote, 93 S.Ct. 2523, admitted that it treated the intrusion of the trunk as a "search" which impinged on a "reasonable expectation of privacy."

trunk of his immobilized car against the government's interest in conducting a warrantless search of the disabled auto under its power to regulate traffic, and to protect the general public against the possibility that a revolver might be taken from the trunk by vandals.

"Here we must decide whether a 'search' of the trunk of the 1967 Ford was unreasonable solely because the local officer had not previously obtained a warrant. And, if that be answered in the negative, we must then determine whether the warrantless search was unreasonable within the meaning of the Fourth and Fourteenth Amendments. In answering these questions, two factual considerations deserve emphasis. First, the police had exercised a form of custody or control over the 1967 Thunderbird. Respondent's vehicle was disabled as a result of the accident, and constituted a nuisance along the highway. Respondent, being intoxicated (and later comatose), could not make arrangements to have the vehicle towed and stored. At the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage. Second, both the state courts and the District Court found as a fact that the search of the trunk to retrieve the revolver was 'standard procedure in [that police] department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands. Although the trunk was locked, the car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it. . . . Particularly in nonmetropolitan jurisdictions such as those involved here, enforcement of the traffic laws and supervision of vehicle traffic may be a large part of a police officer's job. We believe that the Court of Appeals should have accepted, as did the state courts and the District Court, the findings with respect to Officer Weiss' specific motivation and the fact that the procedure he followed was 'standard.' " *Cady, supra*, 413 U.S. at 442–443, 93 S.Ct. at 2528–29.

Based on this analysis of the competing interests, the court held,

". . . [T]he type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained. The Framers of the Fourth Amendment have given us only the general standard of 'unreasonableness' as a guide in determining whether searches and seizures meet the standard of that Amendment in those cases where a warrant is not required. Very little that has been said in our previous decisions . . . and very little that we might say here can usefully refine the language of the Amendment itself in order to evolve some detailed formula for judging cases such as this. Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments." *Cady, supra* at 447–448, 93 S.Ct. at 2531.

■ Recently, in *Opperman, supra* the court permitted a warrantless intrusion into a defendant's diminished expectation of privacy in his automobile which was illegally parked and subsequently towed and subjected to a comprehensive inventory search by police authorities who then located marijuana in the closed glove compartment of the car. In validating the warrantless search the United States Supreme Court balanced the defendant's diminished privacy interest against the government's legitimate law enforcement interests in conducting comprehensive, warrantless inventory searches of automobiles which lawfully come into their custody. The court wrote:

". . . [L]ess rigorous warrant requirements govern because the *expectation of privacy* with respect to one's automobile is *significantly less* than that relating to one's home or office. In dis-

charging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. *Cady v. Dombrowski, supra*, 413 U.S. 433, at 442, [93 S.Ct. [2523], at 2528, 37 L.Ed.2d 706]. Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

"The expectation of privacy as to autos is further diminished by the obviously public nature of automobile travel. Only two Terms ago, the Court noted:

'One has a *lesser expectation of privacy* in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.'

*Cardwell v. Lewis*, 417 U.S. [583], at 590, [94 S.Ct. [2464], at 2469, 41 L.Ed.2d 325].

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' *Cady v. Dombrowski, supra*, 413 U.S. at 441, [93 S.Ct. [2523], at 2528, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, *United States v. Mitchell*, 458 F.2d 960, 961 (CA9 1972); the protection [of] the police against claims or disputes over lost or stolen property, *United States v. Kelehar*, 470 F.2d 176, 178 (CA5 1972); and the protection of the police from potential danger, *Cooper v. California*, 386 U.S. 58, at 61–62, [87 S.Ct. [788], at 790, 17 L.Ed.2d 730]. The practice has been viewed as essential to respond to incidents of theft or vandalism. See *Cabbler v. Commonwealth*, 212 Va. 520, 184 S.E.2d 781, 782 (1971), cert. denied, 405 U.S. 1073, 1501, [92 S.Ct. 1501, 31 L.Ed.2d 807] (1972); *Warrix v. State*, 50 Wis.2d 368, 376, 184 N.W.2d 189; 1974 (1971). In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned." *See, Opperman, supra*, 428 U.S. at 367–369, 96 S.Ct. at 3096–3097.[30]

---

**30.** The Court recognizes that the *Opperman* opinion took great care to distinguish premises searches from automobile searches. Thus Mr. Chief Justice Burger, speaking for the majority in *Opperman* wrote at 367, 96 S.Ct. at 3095:

"This Court has traditionally drawn an distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are 'effects' and thus within the reach of the Fourth Amendment . . . warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not."

*See also, United States v. Mirmelli,*, 421 F.Supp. 684, 691 (D.N.J., 1976). *Compare, State v. Opperman*, 247 N.W.2d 673, 674–675 (S.D.Sup.Ct., 1976) (Holding on remand from the United States Supreme Court, under a "balancing" test, that the auto search violated the

■ These recent decisions of the United States Supreme Court guide the analysis which a district court must apply when a defendant moves to suppress material which the evidence at the suppression hearing reveals was obtained without a warrant pursuant to a search or seizure based on probable cause.[31] First the Court must employ the combined subjective and objective standard articulated in Mr. Justice Harlan's opinion in *Katz, supra,* and decide whether a reasonable expectation of privacy was invaded by the officials who obtained the information.[32] Second, if the Court finds

South Dakota State Constitution.) This Court reads the distinction delineated in the *Opperman* decision as an indication that the balance of the Fourth Amendment interests to be struck may differ depending on whether the object searched is an auto or residential or business premises. The Court does not read the *Opperman* qualification as a suggestion that balancing competing Fourth Amendment interests is proper when analyzing searches into autos, but that slavish adherence to rigid formalist rules is proper when analyzing premises searches. Such a distinction between the approach to be applied to premises and autos would be inconsistent with the fundamental doctrine of *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) that "the Fourth Amendment protects people, not places." *See also, Camara v. Municipal Court,* 387 U.S. 523, 536–537, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (The Fourth Amendment requires interest balancing.) Therefore the Court concludes that the balancing of identifiable interests approach delineated in the context of an auto search in *Opperman* is equally applicable to the analysis of premises searches like that which occurred in Perez's case. The Court recognizes that a defendant's privacy interest in his residential or business premises is usually entitled to greater weight than his privacy interest in an automobile. Therefore the Government must demonstrate unique facts in order to show that the defendant's reasonable expectation of privacy in his premises is lessened. Having established that an expectation of premises privacy is diminished, the Government may justify a warrantless, probable cause intrusion into that diminished expectation of privacy in a dwelling or place of business only by proof of the existence of a compelling social interest which outweighs the defendant's Fourth Amendment protection against warrantless intrusions into his dwelling or business location. The Court finds that the Government sustained its heavy burden in this case, and in so holding the Court notes that it touches on a question which the United States Supreme Court has repeatedly refused to decide: i. e., under what circumstances an officer *must obtain a warrant before he may lawfully enter private premises to effect an arrest which will become the springboard for a search. See,* United States v. Watson, 423 U.S. 411, 418, fn. 6, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 113, fn. 13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Coolidge v. New Hampshire,* 403 U.S. 443, 474–481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Davis v. Mississippi,* 394 U.S. 721, 728, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). *Compare, State v. Ranker,* 343 So.2d 189 (La.Sup.Ct., 1977).

**31.** The Court notes two distinctions between Perez's case and *Opperman,* which the Court does not find significant in resolving the case before it. First, probable cause was not treated as a prerequisite for the *Opperman* search, which was motivated by the civil purpose of inventoring the civilly impounded vehicle. It is this Court's view that before the officers could conduct the *second* search of Perez's property, which was motivated by their desire to conduct a search for *evidence of a crime,* they were required to possess probable cause that such evidence existed on the premises. Second, the initial intrusion, as well as the thorough, all encompassing search of the auto in *Opperman,* was motivated by the civil regulatory purposes of inventoring property which was in the officers' custody for administrative, noncriminal reasons. While the initial intrusion into Perez's privacy was motivated by a civil emergency, the fire, the subsequent, all encompassing search was motivated by the officers' desire to obtain evidence of a crime which threatened the surrounding community. Thus in *Opperman* the totality of the officers' search process was for civil purposes and therefore entitled to great leeway under the Fourth Amendment, *see, Camara v. Municipal Court,* 387 U.S. 523, 534–540, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); whereas the second search of Perez's property must be examined under more stringent criminal standards. While these theoretical distinctions exist, the Court is satisfied that the Government established a sufficiently compelling interest to conduct the immediate search *for dynamite* to overcome these two differences.

**32.** Of course a defendant who seeks exclusion of evidence under the Fourth Amendment must usually establish his standing to assert that right. *See, Alderman v. United States,* 394 U.S. 165, 173–179, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). However, the rigid Fourth Amendment standing requirement may not always be appropriate when a federal court is urged to suppress evidence under either the Due Process Clause of the Fifth Amendment or its Supervisory Power, if it finds that federal officers en-

that an individual's identifiable privacy interest was invaded, it must next determine whether that privacy interest was in any way *diminished* because of unique facts and circumstances immediately preceding the search. If the Court concludes that the privacy interest involved is reduced, then the Court must balance the individual's diminished privacy interest against the competing interests which motivated the authorities to conduct the warrantless search, based on probable cause. In striking this balance the Court may conclude that the authorities' conduct is "reasonable" under the Fourth Amendment *only* if the social or governmental purposes motivating the warrantless, probable cause search and seizure are closely related to substantial *legitimate* social or governmental interests which override the *diminished* privacy interest.[33]

## III

UNDER THE BALANCING TEST MANDATED BY OPPERMAN, SUPRA, THE WARRANTLESS SEARCH OF PEREZ'S RESIDENTIAL PREMISES WAS REASONABLE AND THEREFORE DID NOT VIOLATE THE FOURTH OR FOURTEENTH AMENDMENTS.

■ In applying the Fourth Amendment balancing test exemplified by *Opperman, supra,* to Perez's case the first inquiry is whether the authorities intruded upon an actual or subjective expectation of privacy which Perez exhibited and in addition that his subjective expectation of privacy is one which "society is prepared to recognize as 'reasonable.'"[34] The fact that the guns were located on his residential premises, one in a closet and one in a suitcase in the garage,[35] supports the inference that Perez

gaged in outrageous or intentional criminal conduct, *see, United States v. Valencia,* 541 F.2d 618, 621, 622 (6th Cir., 1976); *Rochin v. California,* 342 U.S. 165, 166–174, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

**33.** In several additional recent cases the United States Supreme Court stressed that courts must balance interests in resolving Fourth Amendment exclusionary rule problems. *See, Stone v. Powell,* 428 U.S. 465, 488–496, 96 S.Ct. 3037, 3049–3052, 49 L.Ed.2d 1067 (1976); *United States v. Martinez-Fuerte,* 428 U.S. 543, 554–567, 96 S.Ct. 3074, 3081–3087, 49 L.Ed.2d 1116 (1967) ("In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual . . . ."); *United States v. Janis,* 428 U.S. 433, 451–460, 96 S.Ct. 3021, 3031–3035, 49 L.Ed.2d 1046 (1976); *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Peltier,* 422 U.S. 531, 537–538, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). In striking the appropriate Fourth Amendment balance, courts should heed the comments of Judge Weick of the Sixth Circuit Court of Appeals who wisely wrote:

"It must be remembered that police officers, unlike Judges and lawyers, are not trained in the nuances of the law of search and seizure, and often are confronted with emergencies which require quick action and which endanger their lives. Of course they do know that illegal traffic in narcotics and guns is very dangerous to our society. It is the job of the officers to apprehend the law violators and to bring them to justice.

"If [the defendant] is guilty of the offenses of which he has been charged, he ought not to be released, without trial, on any such technicality as existed in this case." *See, United States v. Edmond,* 548 F.2d 1256, p. 1259 (1977).

*Compare, United States v. Martinez-Fuerte,* 428 U.S. 543, 568, 96 S.Ct. 3074, 3088, 49 L.Ed.2d 1116 (1976) (Mr. Justice Brennan's dissent, "Consistent with this purpose to debilitate Fourth Amendment protections, the Court's decision today virtually empties the Amendment of its reasonableness requirement . . . .") This Court's attention today focuses on the appropriate balance for determining whether or not the Fourth Amendment has been violated, not on the question of, whether the exclusionary rule should be invoked, assuming such a violation has occurred.

**34.** *See, Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, concurring); *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967); *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *United States v. White,* 401 U.S. 745, 750–754, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *Anyes, supra* at 74–82, 88–89.

**35.** The suitcase located in the garage matched the description of the suitcase which Fireman Welker saw Perez carry when he ran out of the house with the duffle bag which was located in the rear yard prior to the second all encompassing search for dynamite. Tr. 33–35, 38, 44–49, 53–54, 63–64, 73–75, 81–82. The initial

sought to shield those items from the view of others. Consequently his conduct exhibits an actual or subjective, personalized expectation of privacy with respect to the location of the two guns which he seeks to suppress. In addition, Perez's expectation that items hidden on his residential premises were located in a private place constitutes a subjective expectation of privacy in his home which the United States Supreme Court has repeatedly held to be an expectation "that society is prepared to recognize as 'reasonable.' "[36] Therefore, Perez retains an identifiable privacy interest in the guns which he seeks to suppress because the evidence demonstrates that he maintained a "reasonable expectation of privacy" with respect to those guns under the standards expressed by Mr. Justice Harlan in *Katz, supra*.

However, the fact that Perez retains an identifiable privacy interest regarding his hidden guns does not conclude the analysis.

Under the post-*Katz* cases, including *Opperman, supra*, the Court must next determine whether Perez's privacy interest was in any way *diminished* because of the unique facts and circumstances immediately preceding the search of his home and garage.

The *Opperman* court stressed that an individual's identifiable Fourth Amendment privacy interest with respect to an automobile, is significantly diminished because of facts and circumstances unique to automobiles, such as the pervasive noncriminal, administrative regulation to which automobiles are subjected. The court wrote that, cars function in the context of "public scrutiny" and that governmental authorities are necessarily brought into intimate contact with automobiles for "*distinctly noncriminal*" reasons, including periodic inspections, for expired license plates and examination stickers, for excessive automotive noise and exhaust, and for defective headlights or other safety equipment.[37]

fire furnished the lawful reason for the officers' presence throughout Perez's premises, including the garage. *See* cases cited in footnote 38. In addition to lawful presence, the officers, after the discovery of the dynamite in the dufflebag and the comprehensive second search of the house which revealed the shotgun hidden in the closet, had probable cause to believe that the suitcase was hidden on the premises outside the house and that it, like the dufflebag, contained dangerous explosives or weapons. Therefore the officers lawfully seized and opened the suitcase when they discovered it in the garage because: (1) they were lawfully positioned when they discovered it; (2) they had probable cause to believe it contained high explosives or dangerous weapons; (3) the explosives and weapons for which they searched presented an overriding, imminent threat of massive physical violence to the neighboring community.

**36.** *See* cases cited in footnote 34, *supra*, as well as those cited in Part II of the text of this opinion, at pages 276–277.

**37.** *See* text of this opinion accompanying footnote 30, *supra*. Other courts have repeatedly recognized that a legitimate warrantless entry of a defendant's premises by government agents diminishes the defendant's privacy interest. *Lewis v. United States*, 385 U.S. 206, 210–211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) (Fourth Amendment not violated by warrantless entry by undercover agent at defendant's invitation); *United States v. Glassel*, 488 F.2d

143, 145 (9th Cir., 1973) (Similar to *Lewis, supra*, where seizure of contraband in plain view of the undercover agent was validated); *United States v. Berrett*, 513 F.2d 154, 155–156 (1st Cir., 1975) (knowledge of stolen calculators observed by officers on the defendant's business premises pursuant to "public invitation" used to obtain a warrant); *United States v. Romano*, 388 F.Supp. 101, 104–105 (E.D.Pa., 1975) ("Not every object near or attached to a dwelling is entitled to Fourth Amendment protection."); *United States v. Herndon*, 390 F.Supp. 1017, 1021 (S.D.Fla., 1975) (Warrantless search of house and barn by county officers who entered the premises with probable cause to believe a shooting occurred was valid under the exigent circumstances of searching for a possible victim and therefore federal agents, notified by the county officers of the existence of an illegal still observed on the property, could seize it without a warrant during a second search.); *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (A person who stands in the open doorway leading to the vestibule of a house is located in a "public place"); *Contrast, United States v. Carriger*, 541 F.2d 545, 549–550 (6th Cir., 1976) (Holding that the *Katz* test does not always shrink the protections afforded by the pre-*Katz* technical trespass rule).

In previous fire, residential-premises, warrantless search cases, courts have recognized the diminished character of a defendant's reasonable privacy expectations. *See, United States v. Green*, 474 F.2d 1385, 1389–1390 (5th

The evidence recorded during defendant Perez's suppression hearing demonstrates facts and circumstances which likewise significantly diminish Perez's Fourth Amendment expectation of privacy. The fire and police authorities entered Perez's residential premises in response to an alarm and located a fire in the kitchen. Thus the initial intrusion was lawful because it was predicated on the civil, "distinctly noncriminal," emergency resulting from the fire on the property. Once lawfully on Perez's premises for the noncriminal purpose of extinguishing a fire, Assistant Fire Chief Rogers, aided by Police Officers Boomer and O'Grady, conducted a lawful search throughout the house to determine the scope of the fire and to insure the evacuation of the building.[38] During this administrative search O'Grady located plants which he recognized as marijuana, and subsequently arrested Perez, who was removed from the premises. Therefore, at the time Perez was arrested his reasonable expectation of privacy in his residential premises was significantly diminished because the fire, a *noncriminal* emergency, furnished the governmental agents with authority to lawfully and pervasively intrude throughout his residential premises without a warrant in order to extinguish the fire and evacuate the site. At the point in time when the governmental agents gained that authority, Perez's privacy interest, i. e., the right to be let alone,[39] in his domestic premises was diminished in exactly the same fashion as that of the defendant in *Opperman*. In *Opperman*, the object searched, an automobile, was lawfully subject to pervasive warrantless examination by the government for *noncriminal* reasons and was lawfully in the sole custody of the government at the time of the search because of a *noncriminal* purpose. In Perez's case, his premises, the object searched, was likewise, subject to pervasive warrantless examination by government officials for the noncriminal[40] reason that a fire emergency existed thereon, and similar to the car searched in *Opperman*, Perez's residential premises were

Cir., 1973); *Steigler v. Anderson*, 496 F.2d 793, 798 (3rd Cir., 1974); *United States v. Guidry*, 534 F.2d 1220, 1222 (6th Cir., 1976); *People v. Kulick*, 57 Mich.App. 126, 225 N.W.2d 709, 712 (1974); *Montana v. Murdock*, 160 Mont. 95, 500 P.2d 387, 391 (1972); *Contrast, People v. Tyler*, 399 Mich. 564, 250 N.W.2d 467, 476, fn. 25 (1977) (Holding that a defendant maintains a reasonable expectation of privacy in his fire damaged premises so long as the premises are not abandoned.); Note, "*Arson Investigations and the Fourth Amendment*," 30 Wash. and Lee L.Rev. 133, 145, fn. 86 (1973).

**38.** All courts that have confronted the problem agree that a fire is a sufficient reason to permit government officials to enter on to private premises without a warrant. *See, Steigler v. Anderson*, 496 F.2d 793, 795 (3rd Cir., 1974); *United States v. Green*, 474 F.2d 1385, 1388 (5th Cir., 1973); *United States v. Guidry*, 534 F.2d 1220, 1221, 1223 (6th Cir., 1976); *Bennett v. Commonwealth*, 212 Va. 863, 188 S.E.2d 215, 217 (1972); *People v. Tyler*, 399 Mich. 564, 250 N.W.2d 467, 474 (1977).

**39.** *Olmstead v. United States*, 277 U.S. 438, 473–475, 48 S.Ct. 564, 72 L.Ed. 944 (1938) (Mr. Justice Brandeis, dissenting); Warren and Brandeis, "*The Right To Privacy*," 4 Harv.L. Rev. 193, 195 (1890).

**40.** By relying on the distinctly "*noncriminal*" purpose which motivated the authorities' initial legitimate entry, both this Court as well as the *Opperman* court, limit the possibility that "pretext" searches will escape judicial scrutiny under the emerging Fourth Amendment balancing test. Obviously, when the initial governmental intrusion into a defendant's premises is motivated by a reason in any way related to a "criminal" investigation, then the balance is shifted sharply in favor of the defendant and the court must exercise utmost care in order to assure that the reasons offered for the initial intrusion are not pretexts for inexcusably avoiding the warrant requirement. *South Dakota v. Opperman*, 428 U.S. 364, 382, 96 S.Ct. 3092, 3103, 49 L.Ed.2d 1000 (1976) (Mr. Justice Powell, concurring); *for an assessment of pretext searches, see, Amador-Gonzalez v. United States*, 391 F.2d 308, 313–315 (5th Cir., 1968); *Taglavore v. United States*, 291 F.2d 262, 265–267 (9th Cir., 1961); *McKnight v. United States*, 87 U.S.App.D.C. 151, 183 F.2d 977, 978 (1950); *Blazak v. Eyman*, 339 F.Supp. 40, 42–43 (D.Ariz., 1971); *United States v. Carriger*, 541 F.2d 545, 553 (6th Cir., 1976); *United States v. Robinson*, 414 U.S. 218, 246–248, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (Mr. Justice Marshall, dissenting); *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Abel v. United States*, 362 U.S. 217, 226, 230, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *City of Cleveland v. Tedor*, Case No. 34622, Slip Op., pp. 3–5 (Cuyahoga County Ohio Court of Appeals, March 4, 1976).

lawfully in the sole custody of government officials at the time when the contraband was located in his closet and garage.[41]

Thus the Court concludes that although Perez retained an identifiable Fourth Amendment privacy interest in his residential premises after the initial search and his arrest, that privacy interest was significantly diminished for the same reasons that cognizable privacy interests were diminished in *Opperman*, i. e., because the governmental agents lawfully possessed sole custody of the area searched and at the same time possessed lawful authority to conduct a pervasive warrantless intrusion in the area searched pursuant to a *noncriminal* emergency. Therefore this Court must balance Perez's *diminished* expectation of privacy against the competing governmental interests which motivated the authorities to conduct the warrantless probable cause search of his property.

In striking the appropriate balance of interests, the Court must scrutinize the governmental purposes which motivated the police to conduct the warrantless probable cause search and determine whether those interests are legitimate and substantial enough to override Perez's diminished privacy interest.

Shortly after the kitchen fire was extinguished, and simultaneously with the arrest of Perez by Police Officer O'Grady, Officer Boomer discovered an enormous quantity of high explosives in Perez's backyard[42] in a dufflebag similar to the one Fireman Welker had seen Perez carry out of the house.

These observations furnished the police with probable cause to believe that Perez kept extraordinarily dangerous ordnances in his house and that during the fire he attempted to secret these dangerous items in his yard and garage.[43] The highly explosive characteristics of the contraband discovered in the yard, combined with its proximity to the recently extinguished fire in the house, revealed that a large quantity of dynamite located on those premises might explode at any time and cause a public disaster, injuring innocent citizens walking on the street or neighbors residing in the solitude of their own homes. The governmental purpose motivating the officers' search of the premises was the legitimate need to eradicate the threat to the community of a massive dynamite explosion emanating from Perez's property. In pursuing this important governmental interest, the officers confined their search to Perez's premises, the location in which they possessed probable cause to believe the hazard was located, and thus their warrantless search was closely related to the government's legitimate interests.[44] The Fourth Amendment issue is whether the Government's interests in eradicating from a community the threat of a massive dynamite explosion is sufficient to override Perez's *diminished* privacy interest such that an immediate warrantless search satisfies the "reasonableness" standard of the Fourth and Fourteenth Amendments?

Federal and state courts recognize that a threat of grave danger to society may, in some circumstances, override an individual's

41. *See*, fns. 35, 38, *supra*.

42. The scope of Boomer's initial lawful authority was limited to lawful presence on the premises and he had no authority to go rummaging through items found on the property that were unrelated to the fire. However, his description of his discovery of the dufflebag comports with the plain view warrant exception. *See, Coolidge v. New Hampshire*, 403 U.S. 443, 465–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), Tr. 55–56. It was the lawful discovery which revealed the emergency that justified further, more intrusive, invasions of Perez's privacy by the officers, all of whom were lawfully situated on the Perez property at the time they first became aware of the overriding danger posed by the

dynamite. *Compare, United States v. Shye*, 473 F.2d 1061, 1066 (6th Cir., 1973).

43. Under *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924), Perez had no Fourth Amendment protection in his backyard. However that holding is clearly modified by the reasonable expectation of privacy doctrine of *Katz v. United States*, 389 U.S. 347, 351–352, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

44. *See, People v. Sirhan*, 7 Cal.3d 710, 102 Cal.Rptr. 385, 405, 497 P.2d 1121, 1141 (1972); cert. den. 410 U.S. 947, 93 S.Ct. 1382, 35 L.Ed.2d 613 (1973).

diminished privacy interest.[45] In *Warden v. Hayden*, 387 U.S. 294, 298–300, 87 S.Ct.

**45.** Many courts have recognized that important, legitimate governmental interests may override the Fourth Amendment warrant requirement when official conduct is prompted by the motive of preserving life and reasonably appeared to be necessary for that purpose. See, *People v. Roberts*, 47 Cal.2d 374, 303 P.2d 721, 723–724 (Cal.Sup.Ct., 1956) (Police heard a moaning sound as if from a person in distress, entered defendant's apartment and found evidence in plain sight in the kitchen.); *People v. Superior Court (Peebles)*, 6 Cal.App.3d 379, 85 Cal.Rptr. 803, 804–806 (1970) (Circumstances suggesting the possibility of an unexploded bomb in an apartment held to constitute emergency justifying warrantless search.); *People v. Gomez*, 229 Cal.App.2d 781, 40 Cal.Rptr. 616, 617–618 (1964) (Officer searched, without warrant, pockets of unconscious man having convulsions for the purpose of discovering his ailment.); *United States v. Donato*, 269 F.Supp. 921, 923–924 (E.D.Pa., 1967) (Explosion of firecracker in Federal Mint precipitated warrantless search of all employees' lockers in order to maintain the order and security of the Mint; held valid, and coins found could be introduced against defendant.); *United States v. Grisby*, 335 F.2d 652, 654 (4th Cir., 1964) (Warrantless search of Marine Corporal's living quarters on Parris Island, where he had a diminished privacy expectation was validated because of government's overriding interest in maintaining order and discipline.); *United States v. Scott*, 520 F.2d 697, 700 (9th Cir., 1975) (Warrantless search of apartment upheld where officers had probable cause to believe bank robbery suspects were hidden within one hour after the robbery.); *Salvador v. United States*, 505 F.2d 1348, 1350–1352 (8th Cir., 1974) (Officers in "hot pursuit" of bank robbers permissibly entered apartment with probable cause and without a warrant.); *Kirvelaitis v. Gray*, 513 F.2d 213, 215–216 (6th Cir., 1975) (Officers with probable cause to believe that suspected murderer resided in a particular apartment could enter without a warrant.); *Hopkins v. Alabama*, 524 F.2d 473, 475 (5th Cir., 1976) (Police arrested defendant trying to escape from a residence after a gun battle, and were permitted to search the house for guns because they reasonably feared that the "weapon and its user" might still remain in the house.); *United States v. Hobson*, 519 F.2d 765, 776 (9th Cir., 1975), cert. den. 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975) (Warrantless search of a house which is "reputed to contain an arsenal of weapons and people who know how to use them and have expressed an intent to do so" upheld.); *McGeehan v. Wainwright*, 526 F.2d 397, 399 (5th Cir., 1976) (Warrantless search of house trailer permitted where circumstances provided probable cause to believe that a serious threat to safety was present because of an unaccounted for shotgun.) *Johnson v.*

1642, 18 L.Ed.2d 782 (1967), the United States Supreme Court validated a compre-

*United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) ("There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with."); *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Majority suggests that in "a case where the officers, passing by on the street, hear a shot and a cry for help," they may demand entrance into a home without a warrant.), (Justice Jackson, at 459, 69 S.Ct. at 195, ". . . urgent circumstances might justify a forced entry [into a residence] without a warrant."); *Wyman v. James*, 400 U.S. 309, 318–324, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (Government's important legitimate interests in the administration of welfare outbalance welfare recipient's interest in residential privacy and therefore warrantless caseworker house visits may be compelled as a condition for receipt of benefits without violating the Fourth Amendment.); *Camara v. Municipal Court*, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967) (". . . nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations."). *United States v. Easter*, 552 F.2d 230, 234 (8th Cir., 1977) (Shotgun found in home search without a warrant).

In fire cases, courts have repeatedly invoked *Camara, supra* to validate post fire warrantless residential searches conducted for the purpose of determining the source of the fire and to preserve evidence threatened with immediate destruction. See, *Steigler v. Anderson*, 496 F.2d 793, 796–798 (3rd Cir., 1974); *United States v. Green*, 474 F.2d 1385, 1388–1389 (5th Cir., 1973); *United States v. Gargotto*, 476 F.2d 1009, 1013–1015, 510 F.2d 409, 411–412 (6th Cir., 1975), cert. den. 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477, reh. den. 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 115 (1975); *Bailey v. Michigan*, 493 F.2d 1218, 1219–1220 (6th Cir., 1974); *United States v. Guidry*, 534 F.2d 1220, 1223 (6th Cir., 1976); *Romero v. Superior Court of Los Angeles County*, 266 Cal.App.2d 714, 72 Cal.Rptr. 430, 434–435 (1968) (Search for hidden fires after explosion held reasonable.); *Bennett v. Commonwealth*, 212 Va. 863, 188 S.E.2d 215, 218 (1972) (Warrantless search a day after fire was conducted under "emergency."); *People v. Kulick*, 57 Mich.App. 126, 225 N.W.2d 709, 712–713 (1974) (Search the day after the fire was a continuation of the search which was valid at the time of the fire.); *Contrast, People v. Tyler*, 399 Mich. 564, 250 N.W.2d 467, 476–477 fns. 19, 20 (1977) (Reaching an opposite result.). Perez's case differs from the standard fire cases because the search of his residence was motivated by the police officers' desire to conduct a warrantless search in order to obtain dangerous ordnances which

hensive warrantless search throughout a home in order to search for a fleeing *armed* robber who was obviously a menace to the officers in hot pursuit and to society at large. In *Cady v. Dombrowski,* 413 U.S. 433, 439, 443, 447–448, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) the Supreme Court upheld the reasonableness of an intrusion into an individual's diminished privacy interest in his abandoned automobile where the search was for a dangerous ordnance, a revolver, which posed an overriding threat to society. Likewise, in *United States v. McKinney,* 155 U.S.App.D.C. 299, 477 F.2d 1184, 1185 (1973) the District of Columbia permitted a warrantless police search of a defendant's unoccupied hotel room for a sawed-off shotgun one hour after the weapon was observed by a hotel bellman. The *McKinney* court held at 300, 477 F.2d at 1186:

> "The case at bar did not involve a 'complacent' crime but rather a grave offense which, if not a crime of violence strictly speaking, *obviously posed a danger to the community.* There was strong probable cause to believe that a crime had been committed by the occupant of the room, . . . even though there was a possibility that a justification for possession of such a weapon might be established. The entry by the police detectives was peaceful, and during the day, and had been preceded by entries by the

hotel staff. While a hotel room is entitled to privacy, the police were entitled to take into account that what was involved was a nonresident of the District of Columbia who had recently checked into a transient hotel, and, again, that *this was a sawed-off shotgun, an ominous threat in and of itself* . . . . Under these circumstances we find the entry and seizure valid." [46] (emphasis added).

Applying a similar overriding governmental interest test the court in *United States v. Boyd,* 407 F.Supp. 693 (S.D.N.Y., 1976) denied a motion to suppress rifles seized from an apartment without a warrant, under the following circumstances:

> "Gerald Anthony, a police officer of the New York City Police Department, testified that while on duty he was requested by Richard Smith, the building superintendent of premises 2166 Eighth Avenue, New York City, and by one of the tenants to assist in locating the origin of a water leak in the "J" line of the apartments where defendant's apartment was located. In response thereto, the officer and the superintendent entered an apartment on the third floor of the building, with the consent of the tenant, where they observed water coming down through the ceiling. They traced the leak to the vacant apartment directly above and observed similar leakage through the ceiling of that apartment. They then proceeded

---

presented an overwhelming threat to the community and constituted evidence of crimes totally unrelated to the fire which justified their initial intrusion. Thus, the shotguns discovered on the Perez property were not found inadvertently by firemen sifting the ashes of the fire for evidence of its cause without a warrant, *see, Green, supra* at 1389–1390. Perez would present a quite different case if the police had conducted this warrantless search for evidence which was not related to the cause of the fire, or was not threatened with immediate incineration, or did not pose an overriding danger to the neighboring community. Thus, if the police in Perez's case, motivated by a desire to obtain evidence of a crime unrelated to the fire, commenced the second search for personal papers located on the premises but not threatened by the fire, no overriding social urgency would *exist to justify their not obtaining a warrant,*

and the Court would be more likely to strike the balance of "reasonableness" in favor of the defendant. *See, Gargotto, supra,* 476 F.2d, at 1013–1015; *Green, supra,* 474 F.2d, at 1390; *G. M. Leasing Corp. v. United States,* 429 U.S. 338, 355–358, 97 S.Ct. 619, 630–632, fns. 20, 21, 50 L.Ed.2d 530 (1977); *Boyd v. United States,* 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746 (1883); *Mapp v. Ohio,* 367 U.S. 643, 646, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). However, in unique cases where the security of nationally elected officials is endangered such a warrantless search of personal papers may perhaps be permissible. *See,* fn. 47, *infra. Compare, South Dakota v. Opperman,* 428 U.S. 364, 373, fn. 7, 96 S.Ct. 3092, 3102, 49 L.Ed.2d 1000 (1976) (Mr. Justice Powell, concurring).

**46.** *See also, Dorman v. United States,* 140 U.S. App.D.C. 313, 435 F.2d 385, 392–393 (1970).

to defendant's apartment, which was the next in line on the fifth floor. The officer knocked on defendant's door but received no answer, so he listened at the door and heard both the water running and a television set or radio playing. Both he and the superintendent went down to the fire escape on the fourth floor, climbed to defendant's floor and attempted to look through defendant's window to ascertain the source of the running water. The officer observed a hole, which he assumed to have been caused by a bullet, in the window, and the venetian blind, whereupon he pulled down the window slightly, moved the venetian blind aside and saw a number of rifles stacked up against one wall in the apartment. He and the superintendent then entered the premises through the window by breaking the the bottom half of the window, which was stuck. Weapons were subsequently found under two beds and in the closet of the apartment." *Boyd, supra* at 694.

The *Boyd* court concluded that the police intrusion into the defendant's residential privacy interest was justified by the overriding danger to other occupants of the apartment house caused by the water leaking in the building.

"The court finds that the officer in the instant situation had such a 'legitimate reason' unrelated to any search for contraband for pulling down the window and looking inside defendant's apartment and, further, that there were 'exigent circumstances' which fully justified his entering defendant's premises without a search warrant.

"The leaking water, which the officer observed at first hand in the apartments on the third and fourth floors of the building, presented a dangerous condition which, if allowed to continue might well have caused the collapse of ceilings and walls, endangering the lives of the inhabitants of the apartments. The officer, in testifying, emphasized that 'leaks can cause buildings to collapse and when buildings collapse, people can be killed,' and that he 'felt the property was in

danger of falling.' Under the circumstances, the officer had *a legitimate concern for the imminent threat of injury to persons* from the structural damage in the apartments below defendant's.

"Thus, this court holds that the officer's forcible entry into defendant's premises without awaiting defendant's return or obtaining a search warrant was lawful, since a 'prudent and cautious police officer could reasonably have concluded that immediate entry to the apartment was imperative' to safeguard life and property." (emphasis added) *Boyd* at 695.

In *People v. Sirhan*, 7 Cal.3d 710, 102 Cal.Rptr. 385, 401–405, 497 P.2d 1121, 1137–1141 (1972), cert. den. 410 U.S. 947, 93 S.Ct. 1382, 35 L.Ed.2d 613 (1973), the California Supreme Court wrestled with the question of whether an overriding social interest justified a warrantless intrusion into a defendant's residential premises in the context of the prosecution of Sirhan Sirhan for the assassination of Senator Robert Kennedy. The facts which gave rise to the warrantless search of the defendant's unoccupied bedroom were reported at 401–402, 497 P.2d at 1137–1138.

"On the morning of June 5, 1968, defendant's brothers, Adel and Munir, upon seeing a newspaper picture of defendant in connection with the Kennedy shooting, went to the police station, where Adel was interviewed by Sergeant Brandt, one of the officers who made the search. The officer then knew that the senator had been shot earlier that same morning and presumably was aware that the senator was the successful Democratic candidate for President in the California primary. The officer further knew that the suspect was in custody and apparently knew that the suspect's identity had not theretofore been revealed. Adel advised the officer of the suspect's identity and stated that he (Adel), his two younger brothers, Sirhan and Munir, and their mother lived at a specified address in Pasadena and that their father was in another country. The officer asked if they could search the

home, and Adel replied that 'as far as he was concerned [they] could, however it was his mother's house.' When asked if he wanted the police to call her for permission, Adel replied that she did not know what had happened and he did not want to alarm her.

"Sergeant Brandt, accompanied by two other officers and Adel, then went to the Sirhan residence, arriving about 10:30 a. m. on June 5, 1968. Brandt testified that they 'were interested in evidence of possible conspiracy in that there might be other people that were not yet in custody.' He stated that there was nothing which 'indicated [defendant] was engaged in any conspiracy' but that there was no evidence 'there was not a conspiracy.' Adel admitted the officers into the house. They asked which bedroom belonged to defendant, and Adel directed them to a back bedroom. There the officers opened a closed dressing table drawer and found an envelope bearing the notation 'RFK must be disposed of like his brother was.' On the floor in plain sight they saw a closed notebook. They opened it to see its contents; it contained a prediction of America's downfall, an attack upon its leaders and comments relating to 'doing away' with those leaders. On top of the

dressing table they saw a second notebook which looked 'like a school book.' They looked through it and in it were notations such as 'R.F.K. must be assassinated' and 'Ambassador Goldberg must die.' The envelope and pages from the two notebooks containing the foregoing comments were introduced into evidence by the prosecution. The handwriting on the envelope and in the notebooks was identified as defendant's."

The court rejected Sirhan's charge that the warrantless search of his bedroom violated the Fourth Amendment because "the gravity of the offense," the murder of a United States Senator on the night he won the California Democratic Presidential Primary, constituted a crime of such overriding social significance that the police need not observe the normal warrant restrictions of the Fourth Amendment.[47]

■ *Hayden, Cady, McKinney, Boyd,* and *Sirhan*, at the very least, stand for the proposition that the Fourth Amendment reasonableness test is *not* fractured when government officials intrude upon a defendant's *diminished* residential privacy interest because of a threat of imminent harm to an overriding legitimate social interest. *Cady, McKinney,* and *Boyd* all recognize that

---

**47.** The *Sirhan* court held that the government's interests were so overriding that a warrant was not required *and* even probable cause was not required.

"The heretofore recited evidence indicates that the officers believed that there might be a conspiracy, and although none of the officers mentioned the object thereof they undoubtedly contemplated the obvious possibility of a conspiracy to assassinate political leaders in this country. It also may be inferred from the recited evidence that they believed that an emergency existed and that prompt action on their part was necessary.

"Their beliefs were entirely reasonable. The crime was one of enormous gravity, and the 'gravity of the offense' is an appropriate factor to take into consideration. The victim was a major presidential candidate, and a crime of violence had already been committed against him. The crime thus involved far more than possibly idle threats. Although the officers *did not have reasonable cause to believe that the house contained evidence of a conspiracy* to assassinate prominent political leaders, we believe that *the mere possibility* that there might

be such evidence in the house fully warranted the officers' actions. It is not difficult to envisage what would have been the effect on this nation if several more political assassinations had followed that of Senator Kennedy. Today when assassinations of persons of prominence have repeatedly been committed in this country, it is essential that law enforcement officers be allowed to take fast action in their endeavors to combat such crimes." *See,* 102 Cal. Rptr., at 404, 497 P.2d, at 1140. (emphasis added). This Court rejects the *Sirhan* court's suggestion that a compelling governmental interest may override a defendant's privacy interests even when probable cause is not present. However, the Court shares the view of the *Sirhan* court that important governmental interests, arising when a unique danger is posed to the whole community, permit governmental officials to make warrantless intrusions upon a defendant's privacy expectation *provided* the government's actions are prompted by probable cause. *Compare, Sirhan* with *Boyd v. United States*, 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746 (1883), and authorities cited in fn. 45, *supra.*

**292**

probable cause to believe in the existence of an imminent violent physical harm to large numbers of innocent citizens of a community from the possible misuse of dangerous ordnances constitutes the type of social interest which overrides any defendant's Fourth Amendment privacy protections. When a defendant's privacy interests are measurably abated by a lawful comprehensive search of his residential premises that *diminished* individual privacy interest is outweighed by the more important interest in protecting society from an impending catastrophe.

As the Court delineated above, Perez's interest in residential privacy was severely diminished by the *civil* emergency, the fire, which lawfully placed the police on his property with the authority to travel throughout the premises. After the termination of the fire, but while the police were still lawfully on the premises, they discovered a large quantity of high explosives, which posed a massive threat to the community located around the Perez home. Under these unique circumstances, this Court concludes that the comprehensive, second warrantless search of the premises, designed to uncover evidence of a crime, was permissible because of the overriding governmental interest of protecting society from the potential violent harm of a large dynamite explosion in a residential neighborhood. Since the comprehensive search of the premises was lawful under both the Fourth and Fourteenth Amendments, the fact that shotguns rather than dynamite were discovered is not significant, because the weapons were inadvertently discovered in plain view, during a lawful search of an area on which the officers were lawfully present. *See, Coolidge v. New Hampshire*, 403 U.S. 443, 465–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Alderman v. United States*, 394 U.S. 165, 177, fn. 10, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Therefore, defendant Perez's motion to suppress the evidence seized from his home on October 1, 1976 lacks merit, and is denied.

IT IS SO ORDERED.